No. 24,956

STATE OF KANSAS, *Appellee,* v. PAT McCARTHY, GEORGE OFNER, DICK CRUMPLEY, and J. E. MITCHELL, *Appellants.*

SYLLABUS BY THE COURT.

CRIMINAL LAW—*Burglary—Circumstantial Evidence—Overt Act Supports Conviction of Defendants with an Attempt to Commit Crime of Burglary.* A conviction upon a charge of attempting to commit burglary of freight cars is sustained by evidence tending to show these facts: One of the four defendants obtained an agreement with a car inspector of the Missouri Pacific railway at Atchison to cause cars on a specified freight train from Kansas City to be held at Atchison so as to give them an opportunity to get their contents. The defendants drove at night from Kansas City in two automobiles, containing a shot gun, revolvers, lanterns, wrenches, a screw driver and a jimmy, and on arriving at Atchison stopped about 300 feet from the railroad track near where it entered the yards. Two of them went in search of the car inspector, but after finding him either became suspicious that he was acting in coöperation with the police and therefore abandoned their purpose, or else left him with an agreement to meet them in half an hour where their automobiles were parked. They were taken into custody and the arrest of the others followed at the place where they had stopped. This conclusion is not affected by evidence that the freight train did not arrive until the next morning and that the defendant who made the arrangement with the car inspector at one time in conversation with the others referred to the plan as one for receiving stolen goods.

Appeal from Atchison district court; WILLIAM A. JACKSON, judge. Opinion filed March 8, 1924. Affirmed.

*Charles E. Thompson,* of Kansas City, for the appellants.

*C. B. Griffith,* attorney-general, *John F. Rhodes,* assistant attorney-general, and *Maurice P. O'Keefe,* county attorney, for the appellee.

The opinion of the court was delivered by

MASON, J.: George Ofner and Dick Crumpley, who were informed against jointly with Pat McCarthy and John Mitchell, appeal from a conviction upon a charge of attempting to commit burglary with respect to a freight car. They contend that there was an absolute want of any evidence whatever having a tendency to prove them guilty of the offense charged.

A Missouri Pacific car inspector at Atchison, whose duties included making light repairs and setting out cars found in bad order if they could not be readily repaired, gave testimony to this effect: On the morning of December 14, 1922, McCarthy came to him and asked if he could "set out cars and one thing or the other." The answer being an affirmative McCarthy then inquired if he wanted to make some easy money and being asked for particulars suggested going to a place where their talk would not be overheard. This was done and McCarthy then said he had been hauling whisky and robbing cars on different railroads and knew about a particular freight train to come from Kansas City (which was due in Atchison between 1 and 2 o'clock in the morning)—knew what was in the cars—and could haul in an automobile about $8,000 worth of cigarettes; that all the car inspector had to do was to hold the train about 30 minutes while McCarthy and his partners robbed the box cars. The inspector agreed to do this and it was arranged that he should meet McCarthy and his partners when they returned to Atchison.

John Grey, an accomplice, testified in substance to these facts: On December 14, 1922, or a little later, at Ofner's home in Kansas City, all the defendants being present, McCarthy told them he had made arrangements with a car inspector at Atchison to get some property from the Missouri Pacific—that the car inspector would "fix it so we could get" the merchandise—that "the car whacker said he could set out a car and everything would be all right, safe for us to get the property." The next Monday, December 18, Grey, McCarthy, Crumpley and Ofner made arrangements to go to Atchison.

In talking over the matter it was said that they wanted a truck. They were joined by Mitchell and left Kansas City about eight o'clock in the evening, McCarthy, Ofner and Crumpley going ahead in an Overland touring car belonging to Grey, in which were a shotgun and three revolvers, while Grey and Mitchell followed in a Dodge truck. They reached Atchison about midnight, stopping at Third and S streets near where the Missouri Pacific line from Kansas City enters the first railroad yards, and parking their cars about 300 feet from the track. Grey and McCarthy left the others there and went to look for the car inspector. They did not find him in the yards, but found him at the depot, where the three ate some lunch. The car inspector was called to the telephone. Grey suggested that he thought the inspector was a cop—a stool pigeon; that they were in a mess and should get out—give the deal up. They finished their lunch, paid for it and left, without waiting to talk further with the car inspector, starting back for their cars, intending to return to Kansas City.

The car inspector further testified to this effect: After McCarthy's talk with him he reported the matter to a Missouri Pacific employee whose duties included watching the yards to prevent thefts from cars. After he was called to the telephone as testified to by Grey he had to leave the depot to work a passenger train which had just arrived. Just before he did so McCarthy told him he would see him at the steps at Third and S streets in half an hour —that the other fellows and the cars were waiting there.

There was further evidence to this effect: Grey and McCarthy were arrested a few blocks from the depot by the Missouri Pacific watchman, who had been observing them through the window, and two policemen. A party of five then went to the place where the cars were and took the other three defendants into custody, finding them in the Overland, where a pump gun was lying by the driver. In the Dodge truck a loaded revolver lay in the driver's seat. In the automobiles were also found ammunition, a number of lanterns, wrenches, a screw driver and a jimmy.

The crimes act contains this provision: "Every person who shall attempt to commit an offense prohibited by law, and in such attempt shall do any act toward the commission of such offense but shall fail in the perpetration thereof, or shall be prevented or intercepted in executing the same, upon conviction thereof shall, in cases

where no provision is made by law for the punishment of such attempt, be punished as follows:" (R. S. 21-101.) This statute is but declaratory of the common law, under which it is generally agreed that preparation for the commission of a crime does not by itself constitute an attempt, but to have that effect must be accompanied by an overt act adapted to bringing about the completed offense. (16 C. J. 112; 8 R. C. L. 276.) It is also agreed however that no specific test of universal application can be formulated as to what acts are sufficient for the purpose, but each case must be determined upon its own facts. (16 C. J. 114, note 19; 8 R. C. L. 277, note 2.) Moreover there is an irreconcilable conflict in the decisions on the subject.

Under evidence very similar in its effect to that here presented a defendant was discharged, the scope of the decision being thus indicated in the reporter's headnote:

"One should not be convicted of an attempt to break and enter a dwelling upon evidence merely that he left his home, and met, by prearrangement, a supposed confederate at a saloon on the way to the dwelling, and after loading his revolver there, and procuring extra cartridges for it, went to a drug store and bought chloroform, which, with carpet slippers and the weapon, was found on his person by the officers who arrested him as he came out of the store." (*People v. Youngs,* 122 Mich. 292.)

A dissenting opinion in which the authorities are reviewed at length concludes thus:

"Counsel says that though one may intend to commit a crime, and do many things towards its commission, yet he may repent, and the law gives to him a *locus pœnitentiæ.* But where is this *locus?* Is it at the window which he purposes to enter? or at the gate to the inclosure of the dwelling? or at the dividing line between the public highway and private property? How much distance and time does the law give him to repent? Conversions like that of Paul are rare, especially among criminals. The law will not 'o'erleap itself' to find a time and place for repentance, when the criminal has started forth, armed and equipped to carry out his felonious intent. It may refuse conviction when repentance and abandonment are shown, but not till then. The only reasonable and just rule, in my judgment, is that when one has prepared himself with weapons and tools for the purpose of accomplishing a crime, and has started out to accomplish it, the offense is complete, unless it is shown, as was the case in *Reg. v. McCann,* 28 U. C. Q. B. 514, that he had abandoned his purpose. It would be difficult, if not impossible, to harmonize all the cases. No two are alike in their facts. In the case before us, the plan was perfected. All the preparations were made for carrying it out. The respondent left his home, with the revolver and slippers; had traveled nine miles toward the place; had then provided himself with chloroform, and loaded his

The State v. McCarthy.

revolver; had met his supposed co-conspirator at the place of rendezvous. All these acts were done for the express purpose of committing the crime, and he was prevented from the commission by his arrest. I think that the steps taken constitute something more than a bare preparation, and were acts towards the commission of the crime, within the meaning of the statute." (p. 300.)

On the other hand a conviction for attempting the burglary of a store was upheld on evidence establishing "that having reconnoitered the premises, the prisoner designed and agreed with the witness that at about one o'clock of that night they would commit a burglary, by entering the store of Burk; that in pursuance of such design and agreement, at about the hour of one, they went to the store, through the alley in its rear. That the prisoner carried or caused to be carried there, the set of burglars' tools, and that they were taken there to aid them in committing the burglary. That when they arrived, the prisoner suggested that none of the tools were strong enough to enable them to force an entrance; that they then concluded to enter a blacksmith's shop close by, for the purpose of getting a crowbar, or some other tool, with which to break into the store, and that before they entered the shop an alarm was given, and they were intercepted and were prevented from executing their intended purpose." (*The People v. Lawton,* 56 Barb. 126, 132.)

That decision was followed by the New York court of appeals, it being said in the opinion:

"I do not assert that in the present' case merely procuring the tools with which to commit the burglary constituted an attempt to commit it, and it may be that merely starting on the road towards the building was also insufficient to constitute an attempt. But when the defendants reached the building a different question is presented. The going to the building with the purpose of breaking into it, having procured in furtherance of that design the necessary implements, seems to me to be a sufficient overt act. It may be asked at what point of their proceedings did the acts of the defendants constitute an attempt. It is difficult, if not impossible, to lay down any general rule by which it can be determined whether acts are too remote to constitute an attempt to commit the offense. While the defendants were at a distance from the building they might have changed their minds and abandoned the design. But if the jury believed that the defendant and his associates were at the post office reconnoitering or inspecting it with the intent to break it open, and that they would have done so had their design not been frustrated by the presence or interference of the deceased, the police officer, then I think it could properly find that they were engaged in an attempt to commit burglary." (*People v. Sullivan,* 173 N. Y. 122, 135.)

The following are typical quotations from courts taking a similar view of the question:

"Each case must depend largely upon its particular facts and the inferences which the jury may reasonably draw therefrom. It may be stated, however, as a general proposition that to constitute an attempt to commit a crime there must be an intent to commit it, followed by an overt act or acts tending, but failing to accomplish it. The overt acts need not be such that, if not interrupted, they must result in the commission of the crime. They must, however, be something more than mere preparation, remote from the time and place .of the intended crime; but if they are not thus remote, and are done with the specific intent to commit the crime, and directly tend in some substantial degree to accomplish it, they are sufficient to warrant a conviction." (*State v. Dumas,* 118 Minn. 77, 83.)

"Where a party is indicted for an attempt to murder by shooting with a gun, at what time shall it be said that such party has committed an overt act? Is it necessary, in order to convict, that a party shall be allowed to proceed to do all towards the accomplishment of his crime, except actually to pull the trigger? If not, then when may it be said that an overt act has been committed? When it is proved that a party has the design to kill and has the means to accomplish that design, shall it be held that no crime is committed unless that design is frustrated at the very instant it is attempted to be carried out? Must the citizen be required to imperil his existence up to the time of the actual menace before he can claim the protection of the law and procure the punishment of the offender? The mere buying of the gun would be preparation, and not attempt. The mere buying of a gun and loading it might not constitute an attempt, but when the facts show, in furtherance of the design, that a gun has been procured and loaded; and the party so procuring and loading the gun has armed himself and started out on his ·mission to kill, but is prevented from carrying out his design by such extraneous circumstances as that the party he intends to kill does not come to the point where he expected to carry out his design, or if the party designing to kill is arrested and prevented from carrying out the design, he is clearly guilty of the attempt." (*Stokes v. State,* 92 Miss. 415, 425.)

In the present case under the evidence the defendants had arrived at what was substantially the scene of their contemplated burglary of the freight cars. Three of the party remained there until arrested, while the other two went in search of their supposed accomplice, whose action in going to the telephone may have aroused their suspicion and caused these two to abandon their purpose; or, like the others, they may have still been following out their original plan when arrested. We conclude that the acts of the defendants as set out went beyond mere preparation for the intended burglary and were steps toward the accomplishment of the purpose such as to justify a conviction for an attempt. If not, it would seem that there could be no attempt at burglary unless force were actually used in an effort to gain an entrance, a length to which we are unwilling and unable to go.

This conclusion disposes of the only really difficult point in the case. Two minor matters remain to be considered. There was evidence that the freight train referred to did not arrive in Atchison until about 9 o'clock the next morning. This is not material.

"To constitute an indictable attempt to commit a crime, its consummation must be apparently possible, or in other words, there must be at least an apparent ability to commit it; if the means employed are so clearly unsuitable that it is obvious that the crime cannot be committed, the attempt is not indictable. On the other hand, and apparent possibility is all that is required; if there is an apparent ability to commit the crime in the way attempted, the attempt is indictable, although, unknown to the person making the attempt, the crime cannot be committed because the means employed are in fact unsuitable, or because of extrinsic facts, such as the nonexistence of some essential object." (16 C. J. 116.)

Grey at one place in his testimony said that McCarty told the other defendants that he had made arrangements with the car inspector to come up and receive some stolen property from the Missouri Pacific. On the basis of this evidence it is argued in the appellants' brief that if there was a showing of an attempt to commit any crime it was that of receiving stolen goods and not burglary. It is entirely immaterial what name McCarthy gave to the offense. As already indicated there was abundant proof of the purpose of the defendants to break into the freight cars to steal the property they contained.

The judgment is affirmed.