No. 56,770

STATE OF KANSAS, *Appellee*, v. J. T. GARNER, a/k/a J. TED GARNER, *Appellant*.

(699 P.2d 468)

Opinion filed May 10, 1985.

*Richard E. Blackwell*, of Blackwell & Blackwell, Chartered, of Salina, argued the cause and was on the brief for appellant.

*John Eyer*, county attorney, argued the cause, and *Robert T. Stephan*, attorney general, and *John L. Weingart*, of Finley, Miller, Cashman, Schuetz, Weingart and Schmitt, of Hiawatha, special assistant county attorney, were with him on the brief for appellee.

The opinion of the court was delivered by

PRAGER, J.: This is a direct appeal by the defendant, J. Ted Garner, from jury convictions of attempted theft (K.S.A. 21-3301 and 21-3701), two counts of forgery (K.S.A. 21-3710), and felony murder (K.S.A. 21-3401). The facts in the case are rather complex

and essentially are as follows: Fred Iwert disappeared from his farm home in Washington County, Kansas, on April 20, 1983, and has not been seen since. Iwert, age 66, had been a farmer and cattle raiser all his life in Washington County. Iwert was a widower and his health was not good. He walked with the assistance of a cane, had rather serious health problems, and was taking medication for his thyroid. He was rather ill-kempt in his person and his house was filthy and full of items he had saved. Defendant Garner had resided in Washington County for approximately five years. He was 60 years old and was a semi-retired chiropractor. In addition, Garner had engaged for a number of years in the real estate business. It was his practice to purchase or lease real estate along with the personal property and sell them at a profit. Garner also had income from the sale of antiques, ponies, exotic birds, and coin collections. He had purchased an antique Taiwan taxicab, a Stradivarius violin, and rare coins for a song and later sold them for a sizable profit. A reading of the record would give one the impression he was quite a wheeler-dealer. In April of 1983, his chiropractic office was open only during limited hours, because defendant desired to be semi-retired with plenty of time to engage in his hobbies and business activities.

In the winter of 1981, Garner first met Fred Iwert in a very brief, casual encounter. In mid-August, 1982, the defendant became more interested in Fred Iwert and they developed a closer relationship. According to Garner, he had learned that Iwert was having trouble getting a bull returned from a neighbor's property where it had been for a year. Garner went to Iwert's home where he found Iwert ill and crippled. According to Garner, through his efforts he was able to get the bull back on Iwert's property. Fred Iwert's farm was located approximately three miles from the Garner property. Following the assistance with the bull, Garner returned to the Iwert farm daily to help Iwert do the chores and take care of the cattle, including on one occasion separating some cattle from Iwert's herd to be sold. According to Garner, Fred told him that he was going to sell all of his livestock because he could not handle them any more in his physical condition. After helping Iwert load nineteen head of cattle for sale, Garner and Iwert started having conversations about Fred Iwert's selling his farm and personal property to

Garner. This was only a few weeks after they became well acquainted. According to Garner, they went to the home of Waldemar Iwert, Fred's brother, and started making a list of all of Fred's personal property. According to Garner, on about September 8, 1982, he and Fred Iwert came to a tentative agreement by which Fred Iwert would first lease and then sell his real estate and personal property, including the cattle, to Garner.

On September 10, 1982, Garner personally prepared a bill of sale of personal property and a lease of Fred Iwert's real estate with an option to purchase. According to Garner, he and Fred went to Garner's office, where Garner typed the bill of sale and lease himself and both documents were then signed by Fred Iwert. The prosecution's expert witness testified that in his opinion, Fred Iwert had not signed these two instruments. Upon the execution of the two documents by Fred, Garner testified he paid Fred $30,600 in cash. There is no record of this sum ever having been received by Iwert. According to Garner, Fred Iwert agreed to sell all of his cattle but would thereafter continue feeding the cattle for a period of time. In October of 1982, Garner started discussing arrangements for the consignment and sale of the Iwert cattle with Harold O. Miller of Morrowville. Mr. Miller is a farmer and works part time at the Belleville Sale Barn where his job is to obtain the consignment of cattle for sale at the barn. Miller and Garner had a number of conversations in regard to the consignment and a time for delivery. Apparently attempts to deliver the cattle were postponed several times in early 1983 because of bad weather. About two weeks prior to April 20, 1983, Garner had decided to ship the cattle to the Belleville Sale Barn with an agreed time of delivery of the cattle on April 21, 1983, with the sale to take place on April 22, 1983. It also should be noted that between September 10, 1982, and April 20, 1983, Garner had a number of conversations with various people about renting the Iwert farm and the disposal of the Iwert personal property.

The evidence presented by the prosecutor at the trial showed that Fred Iwert never had any intention of selling his farm or personal property, including the cattle. In November and December of 1982, Iwert bought vast quantities of hay for use at his farm. On March 25, 1983, Iwert had his insurance policy covering his home and cattle modified by providing for insurance

coverage to include only the number of cattle he had on hand. During the period from September 1982 to April 1983, Iwert purchased 500 pounds of calf feed, 100 gallons of gasoline, and 100 gallons of diesel fuel from the Farmers Co-op. During this period Iwert took a calf to the veterinary clinic in Washington to be treated and bought medicine and syringes from the veterinary clinic. On March 10, 1983, Fred Iwert and his brother, Waldemar, entered into the "Payment in Kind" programs with the ASCS office for Washington County. All of these activities by Fred Iwert were completely inconsistent with any intent on his part to sell his real estate and cattle as indicated by the bill of sale and written lease dated September 10, 1982.

Two other items of interest should be mentioned. On the afternoon of April 20, 1983, Fred Iwert went to his bank in Washington, Kansas. The bank loan officer testified he asked Iwert whether he had signed any sales contracts on his property, and Iwert denied that he had. At that time, a new promissory note and security agreement were prepared and signed by Iwert, listing Iwert's cattle to secure the loan. After leaving the bank on April 20, 1983, Iwert went to the county clerk's office at the courthouse and filed his personal property tax statement which listed as his own all of the personal property including the cattle which Garner claimed he had purchased from Iwert in September 1982. It is also interesting to note that, in January of 1983, Garner filed a personal property statement with the Washington County appraiser in which he listed none of the cattle or personal property which Garner claimed he had purchased from Iwert on September 10, 1982.

Garner's activities on April 20, 1983, are also quite significant. On that morning, Garner went to the Washington veterinary clinic and attempted to buy something to put an old horse to sleep. He was told by the clerk that he would have to talk to one of the veterinarians. He then went to the Belleville veterinary clinic and purchased 50 cc's of euthanasia solution which is used to put animals to sleep. It could also be used to put permanently to sleep a man, age 66, weighing 200 pounds. In an interview with the undersheriff in July of 1983, Garner denied going to the veterinary clinic in Belleville and making the purchase of this solution.

During the day of April 20, 1983, a series of events occurred

which obviously prevented the delivery and sale of Fred Iwert's cattle by Garner. On that day, Fred's brother, Waldemar, heard that defendant Garner had bought Fred Iwert's cattle and was selling them through the sale barn in Belleville. Waldemar was upset about this, because Fred had not told him anything about selling out. About 4:00 p.m. on April 20, 1983, Waldemar went to Fred's farm. Fred Iwert was not there at the time but returned from Washington about 5:00 p.m. Fred told Waldemar that he hadn't sold anything to Garner and that he was not selling his cattle. Further, Fred told him that Garner was helping do the chores and that Garner would be there later that evening for that purpose and to give him a hip treatment. Waldemar left Fred's farm to talk to Harold Miller, who had consigned the cattle for Garner with the Belleville Sale Barn. Miller told Waldemar that Garner did have cattle assigned to him which were located in the State Lake area near Fred's farm and that Garner had told Miller that they were cattle that Garner had bought from Fred Iwert. Waldemar told Miller to call Garner and tell him that the cattle would not be sold. Waldemar then drove back to Fred Iwert's home at approximately 9:40 p.m. At this time, Waldemar observed Garner's truck parked on the east side of the road, and Fred's car was gone. Waldemar then went to a neighbor's house to wait. At 10:45 p.m., when Waldemar returned to Fred's farm, Fred's car was there and Garner's truck was gone. Waldemar searched the premises but he could not find Fred. He then notified the Washington County Sheriff at 11:45 p.m. Neither Waldemar nor anyone else has seen Fred since that time.

A deputy sheriff talked with Garner that same evening to see what Garner knew about Fred Iwert's whereabouts. Garner told him that Fred had left with his lady friend and would be back in about two weeks. Garner told the deputy that he had talked with the lady friend while doing Fred's chores and that her name was Martha Cline. In later interviews with various law enforcement officers, the defendant Garner expounded on his story that Fred Iwert had left the Washington County area with his girl friend and headed for Mississippi. According to Garner, during the last of September or early October 1982, Fred Iwert started to talk about his loneliness and his need to find another woman. Garner told Fred that he had at one time been connected with a singles club in Kansas City and that Fred might be able to find a lady

through magazine articles which he gave to Iwert. Garner testified that around Thanksgiving in 1982, he had gone to Fred Iwert's home to do the chores and there was a woman present. Iwert introduced her as Martha Cline from Mississippi. Garner testified that he saw the same lady there on several occasions during the next few days. Garner testified that the next time he saw the lady was in January 1983, when she was at Iwert's home for two or three days. After the January encounter with the lady at Fred's place, the next time Garner saw the lady was on April 20, 1983.

It is interesting that no one in the Washington community other than Garner ever saw the woman or heard that Fred had a girl friend. One witness testified that Fred Iwert remarked that he had heard something about his having a girl friend and commented, "If I do, I wish someone would tell me her name and where she lives, I might like to meet her." Garner testified at the trial that when he went to Fred Iwert's home at approximately 7:30 p.m. on the evening of April 20, 1983, the only person present was Fred Iwert. Fred Iwert advised Garner that they had to hurry and get their work done because Fred had to meet Martha Cline. Fred stated that he wanted Garner to drive him to the intersection of highways U.S. 36 and K-15. According to Garner, he gassed up Fred's car, carried out two boxes and placed them in Fred's car, and then drove to the intersection about twelve miles away. When they arrived at the intersection, there was Martha. After loading the boxes into Martha's car, Fred said, "Well, if things don't work out I may see you in a couple of weeks." Fred Iwert and the woman then drove off in Martha's car which was the last time that Garner ever saw Fred. Garner then went back to Iwert's house, parked Iwert's car and got in his own pickup and started home. After driving a short distance, Garner returned to the farm to check the fires. After using the key Iwert had given him, Garner entered the house, and checked the fires, locked up the house, and drove home. Garner received a telephone call at home from Harold Miller around 10:30 p.m. that evening. Miller advised Garner that Waldemar Iwert had been over to see him, and that Waldemar was not going to let Garner sell the cattle. At that point, Garner advised Miller that he had had possession of the cattle for over seven months, and

that he had intended to ship the cattle on April 21, 1983, the next day.

The prosecutor introduced evidence to discredit the defendant's story that Fred Iwert had voluntarily left the area for Mississippi with his new girl friend, Martha. After Iwert's disappearance, a law enforcement officer made a thorough search of Fred Iwert's home. During the search several items were found and taken into custody. The officer found Fred's favorite walking cane in the kitchen just inside the back door. Fred Iwert's billfold was found in the pocket of his overalls hanging on the door in the bedroom. In the billfold was found Fred Iwert's Kansas driver's license, and in the pocket were personal checks issued to Fred Iwert along with his check register. In the kitchen, the officer found bottles containing Fred's medicine including the medication which he took for his thyroid. The officer also found a number of bank statements which showed that no deposits had been made in the amount of $30,600 which was the amount of cash defendant said he paid Fred Iwert on September 10, 1982, in consideration for the lease of the farm and sale of personal property. The prosecutor argued that it was highly unlikely that Fred Iwert would have run off with a girl friend, leaving behind his favorite walking cane, his driver's license, his check books, and his medicines. This argument surely had a persuasive effect on the jury. The jury heard the testimony of both sides and obviously concluded that defendant Garner had killed Fred Iwert when his scheme to steal Fred's property was frustrated. The jury convicted Garner of attempted theft, two counts of forgery, and felony murder. The defendant appealed to this court.

The first point raised on the appeal is that the trial court erred in not sustaining defendant's motion to dismiss the charges on the basis that the defendant had been denied his right to a speedy trial under K.S.A. 22-3402. Defendant's claim arose because of the following pretrial events: Instead of proceeding by information, the prosecutor decided to take his case before a grand jury. On July 18, 1983, defendant was indicted by a grand jury in Washington County, charging defendant with the crimes of felony theft, two counts of forgery, and felony murder. On that same day, the defendant was arrested and incarcerated. On August 5, 1983, defendant was arraigned on the indictments in district court, and the trial was scheduled to commence on

October 24, 1983. Counsel for the defendant was provided with a complete transcript of the proceedings before the grand jury as soon as the transcript was available. On September 19, 1983, the grand jury reconvened and issued a supersedeas indictment charging the defendant with *attempted* felony theft, two counts of forgery, premeditated murder and felony murder. On that same day, the defendant was arraigned on the supersedeas indictment and again trial was scheduled to commence on October 24, 1983. Apparently there was a defect in the two forgery counts, and on October 7, 1983, the defendant filed a motion to dismiss the supersedeas indictment. The court, orally on that date and by written order on October 12, 1983, dismissed the two forgery counts as defective. As a result of the dismissal of the two forgery counts, the State on October 13, 1983, dismissed the supersedeas indictment in its entirety.

On the same date, the State filed an original complaint charging defendant with the crimes of attempted felony theft, forgery of the bill of sale, forgery of the lease agreement, premeditated murder, and felony murder. On October 17-18, 1983, a preliminary examination was held on the complaint. At the conclusion of the preliminary examination, defendant was bound over for trial to the district court of Washington County. Trial was set to commence on October 24, 1983, which was the same date for trial which had originally been set back in August of 1983. On October 19, 1983, defendant was arraigned and defendant's attorney requested a two-weeks continuance of the trial. When the defendant's motion for continuance was taken up by the court, the court indicated that it was willing to grant defendant's request for a continuance but that there was a problem with respect to the provisions of the speedy trial law. The court stated that trial of the case had been set in August to begin October 24, 1983, and that he could not imagine that defendant's counsel was not prepared for the trial. The court advised the parties that the court would need approximately two weeks to conduct the trial and that January 16, 1984, would be the next opening that the court would have to conduct such a lengthy trial. At that point, counsel for defendant indicated that he understood the court's directive that any request for a continuance by the defendant would constitute a waiver of the speedy trial right. Counsel for the defendant then requested an opportunity to confer with his

client and did so outside the confines of the courtroom. After consultation, the defendant and his attorney returned to the courtroom and the following exchange took place:

"MR. BLACKWELL: The defendant requests a continuance for time to prepare for trial, Your Honor.

"THE COURT: With the understanding that the ninety days speedy trial provision is waived.

"MR. BLACKWELL: Yes, sir."

The trial court then granted defendant's motion for a continuance.

The defendant argues that, under the provisions of K.S.A. 22-3402, a defendant is statutorily required to be brought to trial within 90 days after his arraignment on the charge unless the delay shall happen as a result of the application or fault of the defendant, or a continuance shall be ordered by the court under subsection (3) of that statute. The defendant maintains that the time for trial must be computed from August 5, 1983, when he was arraigned on the first indictment. The defendant argues that the State cannot dismiss the two indictments and then refile the same charges in a new information and avoid the time limitations mandated by the statute, relying on *State v. Cuezze, Houston, & Faltico*, 225 Kan. 274, 589 P.2d 626, *modified on other grounds* 225 Kan. 468, 595 P.2d 723 (1979). The State concedes that the decision in *Cuezze* is applicable but takes the position that the delay in trial beyond the 90-day period was a result of the application of the defendant and, therefore, defendant has waived any claim that he was denied a speedy trial under the provisions of K.S.A. 22-3402.

Under the circumstances, we agree with the position taken by the State and hold that the provisions of K.S.A. 22-3402 do not require a dismissal of this case for failure of the State to provide a speedy trial. K.S.A. 22-3402 provides, in substance, that if any person charged with a crime and held in jail solely by reason thereof shall not be brought to trial within ninety days after arraignment on such charge, such person shall be discharged, *unless the delay shall be the result of the application or fault of the defendant,* or a continuance shall be ordered by the court under subsection (3). In this case, after defendant was originally indicted by a grand jury on the charges, a firm trial date of October 24, 1983, had been set by the court and counsel for the

defendant was obligated to be prepared for trial on that date. When the second indictments were dismissed and the same charges were refiled in the form of an information, there was no substantial change in the charges. Under the circumstances, the trial court would have been justified in proceeding to trial of the case on October 24, 1983. At the time the continuance was granted, the trial court made it clear to all parties that it recognized its obligation to the defendant to see that his right to a speedy trial was protected and also to allow defense counsel a reasonable time for the preparation of the defense. The court also recognized its obligation to the citizens and the State of Kansas to see that the charges were prosecuted in a timely manner. The court also stated, in substance, that he could not see that there was any problem for defense counsel to be prepared to go to trial on October 24, 1983, when the case was originally set. The court stated unequivocally that it was willing to grant a continuance to the defense, but that a continuance would also carry a waiver by the defense to a right to a speedy trial within ninety days as provided by the statute. Defense counsel discussed the matter with the defendant and clearly advised the court that he was requesting a continuance with the understanding that the 90-day speedy trial provision was waived. We have no hesitancy whatsoever in holding that, under the circumstances, the delay occurred as a result of the application or fault of the defendant and that the defendant, with full knowledge of his rights, waived trial within 90 days as provided by K.S.A. 22-3402. We find this point to be without merit.

Defendant's second point on the appeal is that the trial court erred in failing to sustain defendant's motion to dismiss count No. 1 of the information charging defendant with attempted theft and count No. 5 of the information charging felony murder for the reason that the information was fatally defective, because the factual allegations in the information, in light of the language of the bill of particulars, did not contain all of the elements necessary to prove those two offenses. We hold that the language contained in the information on those two counts was legally adequate and complied with statutory provisions. K.S.A. 22-3201 provides that the information shall be a plain and concise written statement of the essential facts constituting the crime charged, which information, drawn in the language of the statute, shall be

deemed sufficient. The Kansas cases applying this statute hold that an information which charges an offense in the language of the statute or its equivalent is sufficient. Further, the exact statutory words need not be used in the information if the meaning is clear. *State v. Lucas*, 221 Kan. 88, 557 P.2d 1296 (1976). See also *State v. Cory*, 211 Kan. 528, 532, 506 P.2d 1115 (1973), involving the sufficiency of an information to charge the crime of attempt to commit burglary. In view of the fact that the information contains the essential elements of attempted felony theft and felony murder, we hold that the trial court properly overruled the motion of the defendant to dismiss those charges on that basis.

The next point raised by the defendant is that the trial court erred in refusing to sustain defendant's motions to dismiss at the conclusion of the State's evidence and at the conclusion of all of the evidence, and defendant's motion for a directed verdict and for an acquittal at the conclusion of all of the evidence. Stated simply, it is the position of the defendant that the evidence presented by the State was not sufficient to sustain a verdict of guilty on the charges of attempted felony theft and felony murder. We will consider each of these charges separately. In regard to the charge of attempted felony theft, as contained in the first count, the defendant maintains that the evidence was insufficient because there was no evidence in the record relating to the day of Fred Iwert's disappearance, April 20, 1983, and, therefore, there was no overt act shown to have been committed by the defendant which could serve as a basis for attempted felony theft. It is the position of the defendant that any acts of the defendant pertaining to the consignment of the cattle with Harold Miller for sale by the sale barn fell into the category of mere preparations and did not constitute an overt act.

The nature of the crime of attempt was discussed in depth in *State v. Gobin*, 216 Kan. 278, 531 P.2d 16 (1975). In *Gobin*, the court stated that the three essential elements for an attempt under K.S.A. 21-3301 are:

"(1) the intent to commit the crime;
"(2) an overt act toward the perpetration of the crime, and (3) a failure to consummate it. . . ." p. 281.

The opinion quotes the comment of the committee on pattern jury instructions covering attempts as follows:

" 'A problem inherent in the law of attempts concerns the point when criminal liability attaches for the overt act. On the one hand mere acts of preparation are insufficient while, on the other, if the accused has performed the final act necessary for the completion of the crime, he could be prosecuted for the crime intended and not for an attempt. The overt act lies somewhere between these two extremes and each case must depend upon its own particular facts. . . .' PIK Criminal 55.01, p. 105.)" p. 281.

The court in *Gobin* observed that it becomes apparent from reading the Kansas cases that no definite rule as to what constitutes an overt act for the purposes of attempt can or should be laid down. Each case must depend largely on its particular facts and the inferences which the jury may reasonably draw therefrom. The problem should be approached with a desire to accomplish substantial justice. It has been said that mere preparation is not sufficient. The accused must have taken steps beyond mere preparation by doing something directly moving toward and bringing nearer the crime he intends to commit. It has been said that there must be some appreciable fragment of the crime committed.

In order to convict the defendant in this case of attempt to commit felony theft, an overt act must have been committed with the actual intent to commit that particular crime. The overt act necessary must extend beyond mere preparations made by the accused and must approach sufficiently near to consummation of the offense to stand either as the first or some subsequent step in a direct movement toward the completed offense. With this rule in mind, we turn to the evidence presented by the prosecution in this case.

In the bill of particulars pertaining to count No. 1, the prosecution alleged, in substance, that the defendant committed an overt act which was continuous from defendant Garner's first comments to Harold Miller in the fall of 1982 that he had cattle to sell. The overt act continued through the conversations between them in which arrangements were made for the consignment and the planned loading of the cattle on April 21, 1983. The jury found that the defendant was guilty of forging the bill of sale to the personal property and the lease/sale agreement pertaining to Fred Iwert's real estate. The bill of particulars states that the defendant failed in his attempted theft of the cattle when Waldemar Iwert, the brother of the victim, heard that Garner was selling the cattle and intervened by discussing the matter with

Harold Miller and informing him that his brother, Fredrick Iwert, had not sold the cattle to Garner. The evidence in this case showed these matters and also proved an overt act on the part of defendant Garner sufficient to establish the crime of attempted theft of the cattle.

Prior to April 20, 1983, the defendant, in consigning the cattle to Harold Miller, had made definite arrangements for the cattle to be picked up at the Iwert farm on April 21, 1983. On the afternoon of April 20, 1983, without the knowledge of Garner, Waldemar Iwert notified his brother Fred of Garner's arrangements for the sale of the cattle and consignment to Harold Miller. When defendant Garner went to Fred Iwert's farm on the evening of April 20, 1983, he did so without knowledge that Fred Iwert had been fully informed of Garner's arrangement to sell the cattle. From this evidence, the jury could have found that Garner went out to the Fred Iwert farm to prepare the cattle for delivery the next day. Before delivery could be made, Garner had to take sole possession of the cattle and place them in a position where they could be picked up. It is important to note that during the telephone call from Harold Miller at approximately 10:30 p.m. on the evening of April 20, 1983, *Garner told Miller that he had had possession of the cattle for seven months.* This was not true. The cattle were located on the farm where Fred Iwert lived. From the evidence, the jury undoubtedly concluded that, when Garner went to Fred Iwert's farm to take sole possession of the cattle, a confrontation took place between Garner and Fred Iwert. As a result of that confrontation, Garner killed Fred Iwert and then disposed of his body.

The overt act committed by Garner, which served as the basis for attempted theft in this case, occurred when defendant Garner went to the Iwert farm to prepare the cattle for shipment and a confrontation ensued. This act of the defendant in going onto Fred Iwert's premises to wrongfully obtain possession of Iwert's cattle went beyond a mere act of preparation. In a general way, it may be said that preparation consists of devising or arranging the means or measures necessary for the commission of the offense and that the attempt is the direct movement toward the commission after the preparations are made. 21 Am. Jur. 2d, Criminal Law § 159, p. 314. The authorities are in agreement that it is difficult to formulate any precise rule as to how close the overt

act must come to the attempted accomplishment of the ultimate criminal result. It has been said that while the act need not be the last proximate act to the consummation of the offense, it must approach sufficiently near to it to stand either as the first or some subsequent step in a direct movement toward the commission of the offense after the preparations are made.

In *State v. McCarthy*, 115 Kan. 583, 224 Pac. 44 (1924), the charge was an attempt to commit burglary of a freight car. The accused made plans with a car inspector who agreed to hold the particular train to be robbed long enough for the goods to be removed. The accused and four confederates arrived at the yards in a car and a truck with the tools necessary to commit the burglary. Three of the party remained near the scene until arrested, while two men went in search of their supposed accomplice, the car inspector. The car inspector testified that the defendant talked with him on the steps of the station and advised that the others were waiting with their vehicles. The accused then left and was arrested a few blocks from the station. The court concluded that the acts of the defendants went beyond mere preparation for the intended burglary and were steps toward the accomplishment of the purpose such as to justify a conviction of an attempt. We note an annotation in 76 A.L.R. 3d 842, on the subject of what conduct amounts to an overt act or acts done toward the commission of larceny so as to sustain a charge of attempt to commit larceny. Cases are cited in that annotation finding an overt act for an attempt to commit larceny where the defendant entered a pasture with the intent to wrongfully steal cattle.

In *State v. Gobin*, 216 Kan. 278, it was held that the presence of two people in a pickup at a swine farm was not a sufficient overt act to convict them of attempted theft where the evidence indicated that the people did not depart from the vehicle and the owner upon arriving at the scene heard no noise from the swine to indicate that any had been disturbed or lifted. There were no swine in the pickup truck. The difficulty in *Gobin* was that there was no evidence from the State that the defendant intended to steal the swine. The evidence in the present case shows clearly a plan for the defendant Garner to take for his own the farm and personal property of Fred Iwert. The jury found that the bill of sale and lease agreement were forged by Garner. Preparations

were made over an extended period of time for the consignment and sale of the cattle. We have concluded that evidence of the defendant's act of going to the Fred Iwert farm on the evening of April 20, 1983, with the obvious intent to take sole possession of the cattle and to prepare them for delivery the following day was sufficient to constitute an attempt to commit felony theft and was sufficient to sustain a conviction on that charge in this case.

Turning to the conviction on the charge of felony murder, we have likewise concluded that the evidence presented by the State was sufficient to sustain that conviction. The defendant was charged and convicted of felony murder while in the attempt to commit the crime of felony theft as defined in K.S.A. 21-3701(a) by obtaining or exerting unauthorized control over the property of Fred Iwert. In the bill of particulars the county attorney alleged as follows:

"The murder of Fredrick Iwert occurred while the defendant, J.T. Garner, was attempting to steal Fredrick Iwert's cattle, by committing an overt act which was continuous from the first comments of the defendant to Harold Miller in the fall of 1982, that the defendant had cattle which he wished to sell and such overt act continued through the conversations between them regarding the actual arrangement consigning the cattle and continuing further to the ultimate consignment and plan to sell and to load the cattle on the morning of April 21, 1983, and the selling of the cattle on April 22, 1983, with the proceeds to go to Garner.

"Once Fredrick Iwert was informed by his brother, Waldemar Iwert, that Garner was attempting to sell Fredrick Iwert's cattle Mr. Garner had to kill Fredrick Iwert to accomplish his plan."

Although the language of the bill of particulars could have been much clearer, we construe this factual statement as alleging that the murder of Fredrick Iwert occurred while the defendant Garner was *attempting to steal* Fred Iwert's cattle. The theory that the homicide took place when defendant Garner went to Fred Iwert's farm to take final possession of the cattle should have come as no surprise to the defense in the case. Prior to trial, the trial court held a hearing on defendant's motion to dismiss based on the position that there was no evidence to prove an attempted theft or a felony murder based thereon. At that hearing the county attorney clearly stated to the court that the prosecution's theory was that when Garner's plan to sell Fred Iwert's cattle was discovered and revealed to Fred Iwert on the afternoon or early evening of April 20, 1983, and Garner by his own statements was at the Iwert farm later that night, *the plot was*

*discovered,* an *altercation occurred* and *the death resulted.* This theory was certainly the basis for the jury's finding of attempted theft and felony murder in the commission of the attempted theft.

In *State v. Lashley,* 233 Kan. 620, 664 P.2d 1358 (1983), it was held that the offense of theft by obtaining or exerting unauthorized control over property under K.S.A. 21-3701(a), when considered in the abstract, is a felony inherently dangerous to human life and is a type of felony which may sustain a conviction under the felony-murder rule. It was stated in the opinion that time, distance, and the causal relationship between the underlying felony and the killing are factors to be considered in determining whether the killing is a part of the felony and, therefore, subject to the felony-murder rule. In the last paragraph in *Lashley,* Justice Lockett emphasized that theft may be the underlying felony in a charge of felony murder only in cases where the discovery of the thief during the course of the theft results in the death of a person. Based on the evidence before us, we have concluded that a jury could find that that is exactly what happened in this case. The defendant, Garner, was on the premises of Fred Iwert and was in the process of taking unauthorized possession of Fred's cattle when a confrontation occurred between Garner and Iwert during which Garner killed Iwert. We hold that the prosecution's evidence was sufficient to sustain a conviction for the crime of felony murder as found by the jury in this case.

The next point raised by the defendant on the appeal is that the trial court erred in ruling that statements made by Fred Iwert to his sister, Rosa Ackman, were admissible as an exception to the hearsay rule. During the trial, Rosa Ackman was asked questions regarding conversations that she had with her brother, Fred, concerning his cattle. In her testimony, Mrs. Ackman related a conversation she had with Fred in which she suggested that Fred sell the place and enjoy life. His response was that, if he sold his cattle, he would have nothing left and that if he had to dispose of his cattle there was no use of his living. This evidence was offered by the State to show Fred Iwert had no intention to sell his cattle. We hold that the trial court did not abuse its discretion in admitting the testimony and that it was admissible under K.S.A. 60-460(d)(3).

The final issue raised on the appeal is that the trial court erred in refusing to give an instruction better defining attempt. Prior to the giving of the instructions to the jury, the defendant orally requested an instruction that would distinguish between an attempt and acts of mere preparation. The record does not show that defendant provided the court with a proposed written instruction. The instructions given by the court required the jury to find that the defendant performed an act toward the commission of theft. The trial court also gave an instruction which defined an "overt act" as an act which constitutes a substantial step toward the completion of the crime. Considering the instructions as a whole, we find that they were not misleading or erroneous.

The judgment of the district court is affirmed.