No. 72,142

STATE OF KANSAS, *Appellee,* v. JAMES E. RICHMOND, *Appellant.*

(904 P.2d 974)

Opinion filed October 27, 1995.

*Debra J. Wilson*, assistant appellate defender, argued the cause, and *Jessica R. Kunen*, chief appellate defender, was with her on the brief for appellant.

*Mike E. Ward*, county attorney, argued the cause, and *Carla J. Stovall*, attorney general, was with him on the brief for appellee.

The opinion of the court was delivered by

ALLEGRUCCI, J.: This is a direct appeal by the defendant, James Richmond, from his jury convictions and the sentences imposed for one count each of aggravated burglary, aggravated robbery, rape, and aggravated kidnapping. Under the Habitual Criminal Act, he was sentenced to a controlling term of 45 years to life imprisonment.

Because of the issues raised in this appeal, it is necessary to set out the facts in some detail. On February 14, 1990, J.J. lived with her husband and daughter in their house in rural Butler County. After her husband and daughter left for work and school, J.J. showered, laid out clothes for work, and was putting laundry away. As she was putting clothes in a chest of drawers, she was grabbed from behind around the neck. The attacker threw J.J. on the floor and hit her in the face with his fist a number of times. He broke her nose, and it bled profusely. He told her to stop screaming and, when she turned toward him, he told her not to look at him and began hitting her face again. She resisted when he tried first to pull up the hem of her robe and then to unzip it. He took the watch off her arm, tried to take off her rings, and then demanded that she take them off. Squatting behind J.J., he used both hands to jerk her head to the side. Then he said, "I can kill you anytime I want, do you understand?"

The attacker wanted to know where J.J.'s money was. When she said it was in her purse in the living room, he told her to get it. J.J. went into the living room, took the money from her purse, and gave it to the man. After getting all the money from her purse, he demanded that she show him where her husband's money was. Back in the bedroom, she showed him where there was a bank. He knocked her to the floor with another blow to her nose and

continued hitting her face and head. He reached for the zipper on her robe, she resisted, and he demanded to know where the rest of the money was. She told him there was no more money.

The attacker left J.J. standing near the headboard of the bed while he went through her purse in the living room. She was able to get a look at him. He returned to the bedroom and went through the top drawer of the chest of drawers and a jewelry box. She got another look at him then when he was only 5 to 6 feet away. He kept demanding money, and she told him there was no more in the house.

The attacker knocked J.J. to the floor again and repeatedly hit her in the face with his fists. He looked through the nightstands, and then he told J.J. to lie down. When she said that she could not breathe lying down, he responded that he did not care. He grabbed for the zipper to her robe, and she resisted. He thrust his face to within inches of hers and spoke profanely to her. He walked away and immediately returned to tear the zipper and robe apart.

The attacker ordered J.J. to stand, and then he broke the head-board off the bed by throwing J.J. against it. He told her to lie down on the bed, and she refused. He shoved her and told her to lie face down on the floor.

The attacker fondled J.J.'s buttocks, spread them, and tried un-successfully to penetrate her vagina with his partially erect penis. His efforts included pushing her left leg up, fondling her, removing his glove and inserting his finger into her vaginal area, turning her over, and pushing her legs up. He demanded several times that she "stick it in," and, when he threatened to hit her, she tried to do as he demanded. According to J.J., "He kept pushing and push-ing and he got it in a little ways, but not terribly far." She later told hospital personnel that his penis was inserted into her vagina ½ to 1 inch.

When the attacker jumped up and zipped his pants in response to a noise in the living room, J.J. again got a look at him. He ordered her into the closet and shut the door. At times she could hear him in other parts of the house, and he returned to the bedroom three times. Through the slightly ajar closet door J.J. saw him first look in and then leave again. On the second return, he dumped out a

jar of change which he found in a drawer and then left. The third time he opened the closet door and quizzed her about where the telephones were located. He told her to stay where she was, shut the door, and again left the bedroom.

After approximately 2 or 3 minutes, J.J. thought she heard a car, but she was not certain. She waited another minute or two before cautiously emerging from the closet. The kitchen telephone jack had been ripped from the wall. Richmond was subsequently arrested and convicted for the crimes against J.J.

Richmond first argues that the evidence was insufficient to support his conviction of aggravated kidnapping. This court often has stated:

"If the sufficiency of evidence is challenged in a criminal case, the standard of review is whether, after review of all the evidence, viewed in the light most favorable to the prosecution, the appellate court is convinced that a rational factfinder could have found the defendant guilty beyond a reasonable doubt." *State v. Timley*, 255 Kan. 286, Syl. ¶ 13, 875 P.2d 242 (1994).

K.S.A. 1994 Supp. 21-3420(b) defines kidnapping as "the taking or confining of any person, accomplished by force . . . [or] threat . . . , with the intent to hold such person . . . to facilitate flight or the commission of any crime." When bodily harm is inflicted upon the person kidnapped, aggravated kidnapping results. In the recent case of *State v. Richmond*, 250 Kan. 375, 377, 827 P.2d 743 (1992), the court called *State v. Buggs*, 219 Kan. 203, 547 P.2d 720 (1976), "[t]he leading case on what is required to be proven to establish the facilitation of the commission of any crime provision of K.S.A. 21-3420(b)." In *Buggs*, the court held:

"Our kidnapping statute, K.S.A. 21-3420, requires no particular distance of removal, nor any particular time or place of confinement. Under that statute it is the fact, not the distance, of a taking (or the fact, not the time or place, of confinement) that supplies a necessary element of kidnapping." Syl. ¶ 7.

"The word 'facilitate' in K.S.A. 21-3420 means something more than just to make more convenient. A taking or confining, in order to be said to 'facilitate' a crime, must have some significant bearing on making the commission of the crime 'easier.' " Syl. ¶ 9.

. "If a taking or confining is alleged to have been done to facilitate the commission of another crime, to be kidnapping the resulting movement or confinement:

(a) Must not be slight, inconsequential and merely incidental to the other crime;

(b) Must not be of the kind inherent in the nature of the other crime; and

(c) Must have some significance independent of the other crime in that it makes the other crime substantially easier of commission or substantially lessens the risk of detection." Syl. ¶ 10.

In *Buggs*, a woman and her son were confronted as they left work at the Dairy Queen. Defendants Buggs and Perry forced the victims to go back into the store, where they took the day's receipts from her purse. Then Perry held what was believed to be a gun on the son while Buggs raped the woman at knifepoint. The court rejected the argument that the movement and confinement of the victims was only incidental to the robbery. 219 Kan. at 209-17.

Here, Richmond argues that the taking and confinement of J.J. was incidental to the rape, burglary, and robbery. The State counters that Richmond moved and confined J.J. in order to make easier the commission of aggravated robbery and to facilitate his escape from the crime scene. We agree.

The moving of the robbery victim from room to room is not inherent in the crime of robbery. By enlisting the assistance of J.J. in finding and retrieving money, the robbery was made substantially easier for Richmond.

The State further argues that Richmond's putting J.J. in the closet and shutting the door was confining her within the meaning of 21-3420. The State contends the confinement facilitated both the commission of the robbery and the flight. The rules quoted above govern the confinement to facilitate the commission of the robbery. As the State points out, *Buggs* involves the taking and/or confining the victim to facilitate the commission of crime, but it does not touch on facilitating flight. We find no reason, however, to distinguish between what constitutes facilitating flight and facilitating the commission of a crime under the *Buggs* rules.

Richmond's confining J.J. to the closet made the robbery easier. It allowed him to search for money and valuables without giving her the opportunity to study his appearance and without risking her escaping or calling for help. It also enabled him to flee without being apprehended. From inside the closet J.J. could not see Richmond, his vehicle, or the direction in which he traveled. She was unable to call for help from inside the closet, and she delayed

coming out because she could not be sure when Richmond left. As a result, when J.J. was able to contact the police, Richmond had made his escape. Furthermore, she was unable to give police a description of his vehicle or any idea where he might have gone.

Richmond argues that J.J. was not confined in the closet because she was neither tied nor locked in. He cites several Kansas kidnapping cases in which the victims were tied or locked in, but he cites no authority for the proposition that anything short of the victim's being tied or locked in does not constitute kidnapping. He contends that J.J. "was not prevented, in any way, from leaving the closet." Richmond's physical brutalization of J.J. and his threatening statement that he could kill her at any time establish that she stayed where he put her in the closet out of well-founded fear. Stated another way, she would not have stayed in the closet of her own free will.

We find the confinement of J.J. in the closet facilitated Richmond's flight from the scene of the burglary, robbery, and rape within the meaning of 21-3420. There is sufficient evidence from which a rational factfinder could have found Richmond guilty of aggravated kidnapping beyond a reasonable doubt.

Richmond next argues that it was clearly erroneous for the district court to fail to give a cautionary instruction about eyewitness identification. Richmond concedes that a cautionary instruction about eyewitness identification was not requested. K.S.A. 60-251(b) provides:

"No party may assign as error the giving or failure to give an instruction unless he or she objects thereto before the jury retires to consider its verdict stating distinctly the matter to which he or she objects and the grounds of his or her objection unless the instruction is clearly erroneous."

"An instruction is clearly erroneous if the appellate court is firmly convinced that, if the error had not occurred, there is a real possibility that the jury would have returned a different verdict." *State v. Ludlow*, 256 Kan. 139, Syl. ¶ 2, 883 P.2d 1144 (1994).

On appeal, Richmond contends that it is quite possible that a properly instructed jury would not have credited J.J.'s identification of him and therefore would have acquitted him. The instruction

which he contends should have been given is PIK Crim. 3d 52.20. With regard to when this instruction should be given, this court has stated:

"In any criminal action in which eyewitness identification is a critical part of the prosecution's case and there is a serious question about the reliability of the identification, a cautionary instruction should be given advising the jury as to the factors to be considered in weighing the credibility of the eyewitness identification testimony." *State v. Jones*, 234 Kan. 1025, Syl. ¶ 1, 676 P.2d 1281 (1984).

There is no question that eyewitness identification was a critical part of the prosecution's case against Richmond. This is not a case in which the act was admitted and some mitigating circumstance constituted the defense. This is a case where the defendant denies being involved and the victim is the only person who saw the assailant.

The reliability of J.J.'s identification is questioned by Richmond due to her early faltering attempts to identify her assailant. In February 1990, 7 days after the occurrence, J.J. viewed a lineup. Richmond was not in it. She identified one person from the lineup as looking "very similar" to her assailant. J.J. explained that she singled out the man in the lineup as a means of showing the police what her attacker looked like rather than as an identification of him as the attacker. More than a year later, in June 1991, J.J. was unable to select her assailant from a photo lineup which included a picture of Richmond. She explained that he looked different in the photo due to the length of his hair and facial hair. In December 1992, in the hallway outside the courtroom, she first identified Richmond as the man who had attacked her.

At trial, J.J. testified that she was nearsighted but that at the time of the crimes she could clearly see 25 to 30 feet without her glasses. She also testified that she clearly saw her assailant. She listed three instances when she was able to look at him before she was put in the closet: when he was in the living room taking things out of her purse; when he was standing at the chest of drawers to open J.J.'s jewelry box; and when he heard a noise and jumped up and zipped his pants. She testified that she had three additional opportunities to see him after she went into the closet: when he stopped at the bedroom door and looked in the room; when he put his face close

to the closet door; and when he stood at the closet door and asked where the telephones were. When his face was close to the closet door, she could only see part of his face. J.J. testified that she was able to look into his eyes when he was approaching the closet door. Although Richmond raises some questions concerning J.J.'s identification of him as her assailant, the reliability of her eyewitness identification cannot be seriously questioned.

In addition to J.J.'s identification of Richmond, the State presented other evidence tending to link him with the crimes. Detective Thomas Lee testified that he investigated a case involving P.D.K., which resulted in Richmond's conviction. P.D.K. testified that when she returned to her rural Sedgwick County house at mid-morning on January 22, 1990, Richmond jumped from behind a door, hit her several times in the face, and knocked her down. He said, "Don't look at me." He put her face down on the bed and told her he would kill her if she moved. He removed her shoes, socks, and pants, then he dropped his own trousers, and he spread her buttocks. Unsuccessful in pushing his flaccid penis into her vagina, he ordered P.D.K., "You put it in." After ejaculating, he tied her hands and feet with nylons and left the room. P.D.K. estimated that he had been out of the bedroom approximately 20 minutes before he returned, untied her feet, and raped her again. He took jewelry and money from P.D.K. and electronic equipment and appliances from the house. He tore the telephone out of the jack before leaving. There are a number of obvious circumstantial similarities between the attacks on J.J. and P.D.K., and they occurred within weeks of one another in rural areas east of Wichita.

P.D.K. and J.J. viewed the same lineup. P.D.K. and J.J. each picked out the same man as being similar to her attacker. The selected man was in jail on the day J.J. was attacked, February 14, 1990. P.D.K. punctuated her written selection with a question mark, and mentioned that his voice was different from her attacker's voice. P.D.K. positively identified Richmond as her assailant. A fingerprint lifted in P.D.K.'s house matched Richmond's fingerprint.

Negroid hairs which did not match Richmond's sample were obtained in combings of P.D.K.'s pubic hair, just as Negroid hairs

which did not match Richmond's sample were obtained in combings of J.J.'s pubic hair. Both P.D.K. and J.J. are white and Richmond is black. A forensic microanalyst testified that the absence of a match in the samples did not eliminate the possibility that the hairs were Richmond's and that there also was a possibility that a third person's hairs could have been transferred from Richmond to each of the victims.

The final identification evidence was obtained from analysis of semen found on the vaginal and rectal swabs used during a physical examination of J.J. and on her panties and sanitary pad. Tests showed that the semen was produced by a non-secretor, that is, an individual whose ABO blood type is not determinable from other body fluids. Richmond is part of the 20 percent of the population which is non-secreting.

Doubtless, the jury's assignment would have been more focused if PIK Crim. 3d 52.20 had been given. Even if the instruction had been given, the key question remains whether there is a real possibility that the jurors would have discredited J.J.'s identification of Richmond. Richmond's contention that if so instructed, jurors would likely have acquitted him is based on his assertion that "the only evidence against [him] was the eyewitness identification testimony of Mrs. J." There is significant additional evidence against him. In light of that evidence, we are firmly convinced that if the cautionary instruction had been given, there is no real possibility the jury would have acquitted Richmond. Thus, we conclude the failure to instruct on weighing eyewitness testimony is not clearly erroneous.

Richmond also argues that it was clearly erroneous for the district court in instructing on aggravated burglary not to specify the felony which Richmond intended to commit in making the unlawful entry. In *State v. Linn*, 251 Kan. 797, Syl. ¶ 2, 840 P.2d 1133 (1992), this court stated: "An instruction as to the offense of aggravated burglary is defective unless it specifies and sets out the statutory elements of the offense intended by an accused in making the unauthorized entry." The *Linn* rule was reaffirmed in *State v. Rush*, 255 Kan. 672, 679, 877 P.2d 386 (1994). There, the instruction specified the crime of theft as the crime intended, but did not

set out the statutory elements of theft. In the present case, the district court instructed the jury:

"In Count One, the defendant is charged with the crime of aggravated burglary. The defendant pleads not guilty.
   "To establish this charge, each of the following claims must be proved:
1.  That the defendant knowingly entered the residence of [J. and J.J.], Route 1, Augusta, Kansas;
2.  That the defendant did so without authority;
3.  That the defendant did so with the intent to commit a felony or theft therein;
4.  That at the time there was a human being in the residence; and
5.  That this act occurred on or about the 14th day of February, 1990, in Butler County, Kansas."

The information in this case charges aggravated burglary as follows:

"[I]n Butler County, Kansas, on or about the 14th day of February, 1990, JAMES E. RICHMOND, did unlawfully, feloniously, willfully, knowingly and without authority, enter into and remain within the residence of [J. and J.J.], Route 1, Augusta, KS., occupied during the time of said entrance by [J.J.], and with the intent to commit the felony of rape, aggravated robbery and aggravated sodomy therein. K.S.A. 21-3716; K.S.A. 21-4501(c) (AGGRAVATED BURGLARY)."

There is no contention that Richmond objected to the failure to specify the felony or felonies which he intended to commit in entering J.J.'s house. Thus, according to Richmond, the clearly erroneous standard of review which is stated above applies.

In *State v. Maxwell*, 234 Kan. 393, 672 P.2d 590 (1983), this court declined to reverse for the district court's failure to identify the intended felony for the jury. There, the court said that the overwhelming evidence of guilt precluded any real possibility that an instruction properly identifying the intended felony would have affected the outcome. 234 Kan. at 399. In *State v. Watson*, 256 Kan. 396, 404, 885 P.2d 1226 (1994), theft was specified but no elements of that crime were given. The evidence tended to show that the person who tried to break into the back door of the dwelling first tried to determine that it was unoccupied by ringing the front door bell. Thus, crime other than theft was ruled out as the reason for breaking in. The court stated that it was "satisfied the failure to set forth the elements of theft in this case amounts to harmless error because we have a firm belief that beyond a rea-

sonable doubt the error had little, if any, likelihood of having changed the result of the trial." 256 Kan. at 404.

Here, the State argues that the instruction is not clearly erroneous because the "statutory elements of the crime of aggravated burglary were given." Apparently, the State intended to say that the elements of aggravated robbery were given. It also is true that the elements of rape were listed. Aggravated sodomy, the other offense identified in the information, was dismissed before trial. Thus, the jurors were advised of the elements of the offenses actually specified in the information and of the pertinent form of theft, as discussed at the instruction conference. PIK Crim. 3d 59.18 (1994 Supp.) adds the following sentence after the elements of aggravated burglary: "The elements of _____ are (set forth in Instruction No. _____) (as follows:_____)." Thus, if this pattern instruction had been available at the time of Richmond's trial, the only difference between absolute conformance with the pattern instruction and the instruction given would have been a reference to the elements instruction for aggravated robbery (and, perhaps, for rape).

It was error for the district court to fail to set out the statutory elements of the intended felony. As this court stated in *Watson*, however, that is not the end of the inquiry. This error can be harmless if the court is able "to declare a belief that it was harmless beyond a reasonable doubt." 256 Kan. at 404. The defense was that Richmond did not commit the crime. If the jury believed that the man who was in J.J.'s house and who beat her, raped her, and stole money and goods from her house was Richmond, there seems to have been little, if any, chance that the jurors would have considered crimes other than aggravated robbery and rape, for which the elements had been supplied, as the reason for entering the house. We find the error to be harmless.

Richmond contends that it was an abuse of discretion for the district court to admit evidence of a prior crime for the purpose of proving identity. The scope of this court's review is narrow: "Appellate review of a trial court's decision regarding the admissibility of evidence of prior crimes pursuant to K.S.A. 60-455 is limited to whether the trial court abused its discretion or whether the trial

court admitted clearly irrelevant evidence." *State v. Blackmore*, 249 Kan. 668, Syl. ¶ 2, 822 P.2d 49 (1991).

In *State v. Nunn*, 244 Kan. 207, 211, 768 P.2d 268 (1989), the court set out three requirements which must be satisfied when evidence is admitted under K.S.A. 60-455. The district court must find that (1) the evidence is relevant to prove one of the facts specified in the statute; (2) the fact is a disputed, material fact; and (3) probative value of the evidence outweighs its potential prejudice. Specifically with regard to identity as the material fact, this court has stated:

"Where a prior conviction is offered for the purpose of proving identity, the evidence should disclose sufficient facts and circumstances of the offense to raise a reasonable inference that the defendant committed both offenses. *State v. Williams*, 234 Kan. 233, 670 P.2d 1348 (1983); *State v. Bly*, 215 Kan. [168, 177, 523 P.2d 397 (1974)]. Similarity must be shown in order to establish relevancy. *State v. Henson*, 221 Kan. 635, 644, 562 P.2d 51 (1977). It is not sufficient simply to show that the offenses were violations of the same or similar statutes; there should be some evidence of the underlying facts showing the manner in which the other offense was committed so as to raise a reasonable inference that the same person committed both offenses. *State v. Bly*, 215 Kan. at 178. In general see Comment, *Evidence: Admissibility of Similar Offenses as Evidence of Identity in a Criminal Trial*, 14 Washburn L.J. 367 (1975). However, the prior offenses need only be similar, not identical in nature. *State v. Williams*, 234 Kan. at 234." *State v. Breazeale*, 238 Kan. 714, 721, 714 P.2d 1356, *cert. denied* 479 U.S. 846 (1986).

In the present case, the State filed a motion well in advance of the trial setting, seeking to admit evidence of Richmond's conviction of the attack and robbery of P.D.K. The district court conducted a hearing on the motion several months before trial began. The State called as witnesses P.D.K., J.J., and the investigating officer assigned to the P.D.K. case. The district court first concluded that the two crimes bore sufficient similarity and then that the similarities were great enough that the probative value of the evidence outweighed the tendency to prejudice the jury.

At trial, defense counsel renewed objections to admission of the evidence and requested reconsideration. The evidence was admitted, and the jury was instructed as follows: "Evidence has been admitted tending to prove that the defendant committed a crime

other than the present crime charged. This evidence may be considered solely for the purpose of proving the defendant's identity."

On appeal, Richmond contends that the district court abused its discretion in admitting the evidence of his conviction of the attack and robbery of P.D.K. because there was insufficient similarity between that offense and the attack and robbery of J.J. He concedes that there were similarities, but he asserts and emphasizes the following differences:

P.D.K. was bound
P.D.K.'s head was covered with a pillow case
The rapist
  used Vaseline
  entered an empty house
  wore no gloves
  used a knife

Even including the weak and questionable entries, the list of differences compiled by defense counsel are inconsequential in comparison with the similarities of the two attacks:

rural settings
adjoining counties
January 22 and February 14, 1990
white female victims in their forties
  victims alone at home on weekday morning
  victims initially punched in the face
  victims ordered not to look at the attacker
  victims laid face down, buttocks spread, attempted entry from
    behind; semi-erect penis
jewelry taken off victims
house searched for other jewelry, cash, and portable items
telephones disabled
victims gave similar physical descriptions of assailant

The circumstances surrounding these two incidents were so similar in their dominant aspects as to raise a reasonable inference that the offender in one was the offender in the other. The differences pointed out by Richmond demonstrate that the incidents were not

identical but do little or nothing to make the parallels less commanding. Thus, it was not an abuse of discretion for the district court to have admitted evidence of the P.D.K. incident for the purpose of proving identity.

Richmond next complains of the following references to race which were made by the prosecutor during closing argument: "Think about having to divulge to your husband that you were raped by a black male. Think about having to divulge that information to law enforcement officers." "Both of the females are white— Both of the victims white females, forties." Neither remark drew a contemporaneous objection from defense counsel.

The second complained-of remark was included in a list of the similarities between the crimes involving P.D.K. and J.J. Thus, when placed in context, the statement that both victims were white carries no improper message or connotation. It is a straightforward, accurate, and proper statement. It warrants no further attention.

The context in which the first complained-of remark was made was a suggested explanation for the words used by J.J. with regard to the sexual assault varying somewhat, depending on the audience. Here is the surrounding text:

"[Defense counsel] made an issue out of whether there was penetration, whether there was not penetration. And he kept asking [J.J.], 'Well what did you tell Detective Garman? Well what did you tell Deputy Bartlett? What did you tell your husband?'

"Ladies and gentlemen, put yourself in [J.J.'s] shoes, or think about your wife calling you on the phone, she's been attacked, beaten, robbed, and raped. Yes, [J.J.] said almost raped.

"Think about having to divulge to your husband that you were raped by a black male. Think about having to divulge that information to law enforcement officers. Strange men that have come to your home and you had to tell them in detail what's happened to you, about the sexual assault. Think about the difficulty of that. Think about the trauma that you would be undergoing at that time.

"Clearly when you look at the medical records it will reflect that when she got to the hospital room, and she felt comfortable, and she felt safe, and she was with a female nurse, she further disclosed in more detail what had happened to her, and that she was penetrated. But she said it was slight, because it was slight. But she was penetrated."

The prosecutor's point was that J.J. may have understated the circumstances when speaking to her husband and law enforcement

officers, from concern for her husband's feelings about his wife's being sexually assaulted by another man and from culturally prescribed reticence when discussing intimate matters with strangers. Because the prosecutor named the race of the rapist in connection with the victim's telling her husband, there is the further suggestion that his wife's being raped by a black man likely would provoke a more negative reaction from the husband than her being raped by a white man.

The State does not argue that there is any basis in the evidence for the attacker's race being of any significance to J.J.'s husband. The State denies that there was any derogative aspect to the remark and contends simply to have been stating fact. The context, however, does not support the contention. The remark was improper. However, the question of whether the prosecutor's comment amounts to misconduct is not before us. It is firmly established that reversible error cannot be predicated upon a complaint of misconduct of counsel in closing argument where no objection was lodged. *State v. Reed*, 256 Kan. 547, 566, 886 P.2d 854 (1994). In an effort to get around the contemporaneous objection rule, Richmond suggests that the prosecutor's racial remark was so patently improper that the district court had an affirmative duty to interrupt the closing argument and to admonish the jury, irrespective of defense counsel's failure. We find under the facts of this case that the trial judge had no such duty.

Richmond's final argument focuses on the district court's failure to compute Richmond's sentence under the sentencing guidelines. K.S.A. 1994 Supp. 21-4724(f) provides:

"In the case of any person to whom the provisions of this section shall apply, who committed a crime prior to July 1, 1993, but was sentenced after July 1, 1993, the sentencing court shall impose a sentence as provided pursuant to law as the law existed prior to July 1, 1993, and shall compute the appropriate sentence had the person been sentenced pursuant to the Kansas sentencing guidelines."

Richmond falls into the category of persons who were sentenced after the effective date of the Kansas sentencing guidelines for crimes committed before the effective date. He was sentenced on April 15, 1994, for crimes which occurred on February 14, 1990.

At the time of sentencing, the district court judge stated to Richmond, "[B]ecause of the seriousness of the crimes, you are not eligible for any retroactive application of the sentencing guidelines." Richmond concedes that the statement is correct. He argues, however, that "[t]he guidelines sentence must be determined before it can be decided if the defendant is or is not eligible for retroactive application."

We agree. Although computing Richmond's sentence pursuant to the sentencing guidelines will not benefit him, the statute plainly states that the requirement for computation of a guidelines sentence applies in "the case of any person to whom the provisions of this section shall apply." This court, in *State v. Fierro*, 257 Kan. 639, 895 P.2d 186 (1995), interpreted K.S.A. 1993 Supp. 21-4724(f) to require the computation whether or not the defendant benefitted. There, we stated:

"In those cases where a crime is committed prior to July 1, 1993, and sentencing occurs after that date, although the trial court must impose a sentence according to the pre-July 1, 1993, law, K.S.A. 1993 Supp. 21-4724(f) also requires the trial judge to next compute what the sentence would be had the defendant been sentenced pursuant to the Kansas sentencing guidelines. Why is this provision in the statute? The issue before us is one of legislative intent. We believe the provision requiring calculation of the guidelines sentence by the trial court was added by the legislature to enable the trial court to resolve the guidelines issue while the facts were fresh and readily available to both the defendant and the prosecutor and to prevent subsequent appeals to the trial court should the defendant or the prosecutor disagree with the Department of Corrections' calculations on conversion." 257 Kan. at 649.

The judgment of the district court is affirmed in part, reversed in part, and remanded with directions to compute the appropriate sentence pursuant to the sentencing guidelines.