NOT DESIGNATED FOR PUBLICATION

No. 122,660

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

RON RICHARD LARSEN JR.,
*Appellant*.

MEMORANDUM OPINION

Appeal from Johnson District Court; THOMAS KELLY RYAN, judge. Opinion filed July 29, 2022.
Affirmed.

*Korey A. Kaul*, of Kansas Appellate Defender Office, for appellant.

*Daniel G. Obermeier*, assistant district attorney, *Stephen M. Howe*, district attorney, and *Derek Schmidt*, for appellee.

Before ISHERWOOD, P.J., SCHROEDER and WARNER, JJ.

PER CURIAM:  A jury convicted Ron Richard Larsen Jr. of kidnapping, aggravated burglary, attempted aggravated burglary, and one count each of felony and misdemeanor theft. Larsen appeals, claiming the State presented insufficient evidence for the jury to convict him of kidnapping and attempted aggravated burglary. Larsen also claims the State erred in vouching for one of its witnesses during closing argument and the district court erred in imposing an upward durational departure after a separate hearing before the jury where the jury found Larsen presented a future danger to the community and was not

1

amenable to probation. Upon an extensive review of the issues, we find no error. We affirm.

## FACTS

In May 2017, a series of connected burglaries and thefts occurred in Johnson County. The first incident occurred on May 27, 2017, when an individual was seen on a home security system looking into a residence before fleeing the scene. Two days later, on May 29, 2017, a different Johnson County resident encountered an unfamiliar man in his home. The next day, on May 30, 2017, another Johnson County resident reported her vehicle missing.

The State charged Larsen with attempted aggravated burglary, in violation of K.S.A. 2016 Supp. 21-5301 and K.S.A. 2016 Supp. 21-5807(b), a severity level 6 person felony; aggravated burglary, in violation of K.S.A. 2016 Supp. 21-5807(b), a severity level 4 person felony; kidnapping, in violation of K.S.A. 2016 Supp. 21-5408, a severity level 3 person felony; and two counts of theft—one felony and one misdemeanor—in violation of K.S.A. 2016 Supp. 21-5801, a severity level 9 nonperson felony and a class A nonperson misdemeanor, respectively. The State filed a motion for an upward durational departure on the basis Larsen presented a future danger to the community and was not amenable to probation.

Larsen's jury trial began in November 2018, but, after an in-camera hearing, the district court granted Larsen's request for a mistrial. Larsen proceeded to trial again in March 2019.

*Don Tinsley incident*

On May 27, 2017, Don Tinsley was at his Johnson County residence watching TV on his living room couch when he received a notification on his smartphone from his home security system, alerting him motion was detected on his back patio. Tinsley opened the notification on his smartphone, which produced a live video feed showing an unfamiliar male on his back patio. The man on Tinsley's back patio was looking into the window located behind the couch Tinsley was sitting on. After watching the live video surveillance for two to three seconds, Tinsley went upstairs, called 911, woke up his wife, and retrieved a firearm before going back downstairs. When Tinsley went back downstairs, he could not see the man on his patio.

At trial, Tinsley testified that the man on his patio on May 27, 2017, was a Black male with a shaved head, distinctive eyeglasses with a gold ornate frame, and a bandana over his face. The man did not have permission to be on Tinsley's back patio.

Tinsley explained there was a patio light turned on above the back door and there was a light on in the kitchen, which was next to the back door. Tinsley's home security system captured and recorded the individual looking into the house. Law enforcement received the recorded surveillance footage.

Tinsley testified his backyard was enclosed by a fence with three separate gates normally kept closed. Tinsley noticed mud on the patio next to the window the individual was looking in, one of his gates was left open, and there was a footprint next to the gate Tinsley had not noticed before the incident. Tinsley testified he would recognize the person from the surveillance video if he saw the man again and identified Larsen at trial.

Richard Burroughs Jr., Larsen's parole officer in an unrelated case, testified he knew Larsen from a prior contact and provided a detective with the address where Larsen

was living in Lenexa as well as Larsen's phone number. The detective showed Burroughs the surveillance footage from the Tinsley incident and asked if Burroughs recognized the person in the video. Burroughs recognized the man in the video as Larsen and stated Larsen had unique glasses.

*Joshua Mason incident*

On May 29, 2017, around 11:10 p.m., Joshua Mason went downstairs at his Johnson County residence to lock up the house, get a drink of water, and get his phone charger. Mason noticed some lights on in the kitchen that he did not remember being left on and noticed a stronger breeze coming through the kitchen than the attic fan normally brought into the house. Mason grabbed his phone charger and saw an unfamiliar man standing at the other end of the house, about 15-20 feet away from him. Mason heard a metallic click like the rack of a gun slide and heard the man say he had a gun and would shoot. The man told Mason to walk toward him and go down the stairs located by the front door leading to the garage so he could exit out the back door. The man exited the residence through the back door, paused, and exchanged a look with Mason, who was looking toward the man from the stairway.

Once the man was gone, Mason went to the back door and noticed the window was all the way open. A gray bandana was lying outside at the top of the stairs on the deck. Mason picked up the bandana and tossed it into the house before closing and locking the back door. Mason then called the police and woke up his parents who were sleeping upstairs during the incident. Mason's car keys, his mother's purse, and his mother's car keys were missing after the incident.

Mason testified he lived near Sar-Ko-Par Park in Lenexa with his mother, Anne Hauser, and his stepfather. The residence had an unfenced backyard. Mason testified that the man in his house was a clean shaven African American man about 5' 10" tall with a

4

bald head, big glasses, and a bandana around his neck. The man was holding a bag later found to be Hauser's purse. Mason explained the purse was left on a table in the breakfast room and would have been visible from the back deck. The man did not have permission to be inside the Mason-Hauser residence.

Mason told the jury he was afraid the man would shoot him if he did not follow the intruder's commands. The entire interaction lasted under five minutes. Later, Mason met with Detective Allen Beyer, who showed Mason the security footage from Tinsley's back patio security system. Mason stated he was about 80 percent sure the man in the surveillance video was the same man in his house because of his glasses, bald head, and his build. However, unlike at the Tinsley residence, the intruder's face was not concealed during the incident at the Mason-Hauser residence.

Two days after the incident, Mason viewed a photo lineup containing five pictures of similar looking individuals and could not identify the individual in his home with 100 percent certainty. Mason testified he was confident at trial based on his gut feeling and stated, "[B]y seeing him in here, it really made me think that that's the guy." Mason identified Larsen in the courtroom.

The bandana found at the Mason-Hauser residence was also collected and examined for DNA. The bandana was folded in half in a triangle with two ends twisted and wrinkled as if the two ends had been tied together. DNA swabs were collected from the bandana where the two ends were twisted and knotted together as well as from the area that would have covered the suspect's nose or mouth had the bandana been placed over the suspect's face. The DNA swabs showed a mixture of DNA from four individuals, but the primary DNA source was consistent with Larsen's DNA.

5

*Mariah Snyder-Pendlay incident*

On May 30, 2017, around 5:30 a.m., Mariah Snyder-Pendlay called the police about her missing Infiniti QX56. The night before Snyder-Pendlay noticed her vehicle was missing, her family returned from a weekend vacation and decided they would unpack some of the contents in the car the next day. Snyder-Pendlay testified her vehicle was parked in her residential driveway on May 29, 2017, and was not there the next morning. No one had permission to take the vehicle.

Snyder-Pendlay kept her car keys clipped to her purse, which she thought she set down in her backyard while letting her dog out. She testified her purse could have been left in the vehicle, but she believed it was in the backyard because she found the contents of her purse scattered in her yard. Snyder-Pendlay found the side gate to her backyard open, which was unusual as the gate was not regularly used and the family was cautious to keep the gate closed because of their new puppy. Snyder-Pendlay testified she lived near Sar-Ko-Par Park.

The Snyder-Pendlay Infiniti QX56 was later involved in an accident after it was taken from the driveway. An officer from the Herington Police Department and a trooper with the Kansas Highway Patrol were dispatched to the car accident on May 30, 2017. The vehicle was registered to Snyder-Pendlay. The Herington police officer testified the vehicle in the accident was stolen and the driver of the vehicle was Larsen. The officer did not see any purses or wallets in the vehicle but there was a backpack, a black bag, and a cellphone.

Johnson County investigator Noe Gonzalez later processed the property recovered from the stolen Infiniti QX56 and transported it back to Lenexa. Gonzalez explained to the jury the recovered cellphone that was in the stolen vehicle was a prepaid phone and did not have a name associated with the phone number. Gonzalez confirmed from

Burroughs the phone number was tied to Larsen. Gonzales also testified the cell towers in the area revealed the phone was pinging around Larsen's residence and the Tinsley residence, both in a relatively close geographic area of Lenexa. Bo Amos, a Johnson County forensic scientist, extracted data, including text messages, off Larsen's phone. Amos noted he found a selfie picture on the phone and the name Ron Larsen was connected to the photo.

*Ron Larsen's trial testimony*

Larsen explained to the jury he wanted to start a family with his pregnant girlfriend, Kristy Bradford, but did not have a job at the time. Larsen acknowledged there were incriminating text messages on his phone from conversations with Bradford but claimed any references to getting money for her was simply to impress her with a "bad boy persona." Larsen also suggested the text messages about going out and getting money referred to a guy he had met who planned to help Larsen get a job.

Larsen testified that on the night of the Tinsley incident, he found out Bradford's baby was not his and he got drunk and took a box of cold medicine to cope with the news. Because Larsen was intoxicated, he thought someone was chasing him and placed his gray bandana over his face to hide. Larsen admitted the man in Tinsley's surveillance video was him but, because he was intoxicated, Larsen believed he was looking into Bradford's house. Bradford was living in Oklahoma at the time.

Larsen explained to the jury he had also contacted an old friend around the time of the incidents about getting drugs. Larsen's friend told him to go to the baseball field at Shawnee Mission Park during a certain time and day. On May 30, 2017, around midnight, Larsen went to Shawnee Mission Park to get drugs. When he arrived at the park, Larsen followed a mutual friend into an Infiniti SUV to get drugs. The two men then drove to Manhattan to meet another friend. Once Larsen was in Manhattan, one of

his friends asked him to take the Infiniti SUV to Wichita. Larsen claimed he did not know the vehicle was stolen.

*Jury verdict and posttrial proceedings*

The jury convicted Larsen on all counts. The district court, upon the State's motion, conducted a separate proceeding before the jury to determine the existence of aggravating factors that could enhance Larsen's sentence.

The jury found beyond a reasonable doubt Larsen presented a future danger to the community and was not amenable to probation. The district court granted the State's motion for an upward durational departure, based in part on the jury's determination Larsen was not amenable to probation. The upward durational departure applied to Larsen's primary offense of kidnapping, for which the district court sentenced him to 351 months' imprisonment. The district court also sentenced Larsen to 43 months' imprisonment for aggravated burglary, 19 months' imprisonment for attempted aggravated burglary, 7 months' imprisonment for felony theft, and 12 months in jail for misdemeanor theft. Larsen's prison sentences were ordered to run consecutive to each other and his jail sentence to run concurrent. The consecutively imposed sentences totaled 420 months with 36 months of postrelease supervision. Additional facts are set forth as necessary.

ANALYSIS

Larsen does not appeal his convictions for aggravated burglary, felony theft, and misdemeanor theft. Issues not briefed on appeal are deemed waived. *State v. Davis*, 313 Kan. 244, 248, 485 P.3d 174 (2021). Those three convictions are affirmed.

8

*The Evidence Presented Supported Larsen's Kidnapping and Attempted Aggravated Burglary Convictions*.

Larsen challenges the sufficiency of the evidence supporting his kidnapping and attempted aggravated burglary convictions and asks us to vacate those convictions.

*Standard of review*

The standard of review for a sufficiency of the evidence challenge in a criminal case requires us to "'review the evidence in a light most favorable to the State to determine whether a rational factfinder could have found the defendant guilty beyond a reasonable doubt.'" *State v. Aguirre*, 313 Kan. 189, 209, 485 P.3d 576 (2021). There must be evidence supporting each element of a crime charged to meet the sufficiency of the evidence standard. *State v. Kettler*, 299 Kan. 448, 471, 325 P.3d 1075 (2014). We are not allowed to reweigh the evidence, resolve evidentiary conflicts, or make witness credibility determinations. *Aguirre*, 313 Kan. at 209. To the extent we must interpret K.S.A. 2016 Supp. 21-5408, K.S.A. 2016 Supp. 21-5301, or K.S.A. 2016 Supp. 21-5807, our review is unlimited. See *State v. Stoll*, 312 Kan. 726, 736, 480 P.3d 158 (2021).

*Kidnapping*

Larsen contends Mason's confinement was inconsequential, insubstantial, and, therefore, insufficient to constitute a kidnapping. Larsen suggests by moving Mason to the stairway and away from the back door, his risk of detection did not substantially lessen. The State argues Larsen threatened Mason at gunpoint to move away from the back door down the stairs by the garage door to facilitate flight and carry out his escape. The State also contends Larsen's argument merely encourages reweighing the evidence and we should reject it.

9

The jury convicted Larsen of kidnapping Mason in violation of K.S.A. 2016 Supp. 21-5408(a)(2) to facilitate flight or the commission of the burglary. That portion of the statute reads:

> "(a)    Kidnapping is the taking or confining of any person, accomplished by force, threat or deception, with the intent to hold such person:
>
> . . . .
>
> (2)    to facilitate flight or the commission of any crime."

The statute differentiates between the act—taking or confining any person by force, threat, or deception—and the mens rea—the "intent to hold such person . . . to facilitate flight or the commission of any crime." K.S.A. 2016 Supp. 21-5408(a)(2). In *State v. Buggs*, 219 Kan. 203, 215, 547 P.2d 720 (1976), our Supreme Court distinguished a taking severe enough to constitute a kidnapping from a taking merely incidental to the underlying crime. The term "'facilitate,'" as used in K.S.A. 2016 Supp. 21-5408(a)(2), "means something more than just to make more convenient." *Buggs*, 219 Kan. at 215.

The *Buggs* court discussed what is needed for a taking or confining to sustain a kidnapping conviction:

> "[I]f a taking or confinement is alleged to have been done to facilitate the commission of another crime, to be kidnapping the resulting movement or confinement:
>> "(a) Must not be slight, inconsequential and merely incidental to the other crime;
>> "(b) Must not be of the kind inherent in the nature of the other crime; and
>> "(c) Must have some significance independent of the other crime in that it makes
> the other crime substantially easier of commission or substantially lessens the risk of detection." 219 Kan. at 216.

Larsen cites *State v. Burden*, 275 Kan. 934, 942-43, 69 P.3d 1120 (2003), for the proposition the term "facilitate" applies to both the flight and the commission of the

10

crime. *Burden*, however, explains the three-pronged *Buggs* test applies only when "the taking or confining was done with the intent to facilitate flight or the commission of another crime as set forth in [K.S.A. 21-3420(b)—the former kidnapping statute]." *Burden*, 275 Kan. at 943. Our Supreme Court "determined the statutory language 'to facilitate flight or the commission of any crime' did not create alternative means but merely provides 'options within a means.'" *State v. Harris*, 310 Kan. 1026, 1034, 453 P.3d 1172 (2019). That is, the State only had to prove sufficient evidence Larsen held Mason with the intent either "to facilitate flight *or* the commission of any crime." (Emphasis added.) See K.S.A. 2016 Supp. 21-5408(a)(2).

Additionally, a precise distance of removal or time and place of confinement are not required as part of the analysis. *Buggs*, 219 Kan. at 214. The *Buggs* court explained:

> "A standstill robbery on the street is not a kidnapping; the forced removal of the victim to a dark alley for robbery is. The removal of a rape victim from room to room within a dwelling solely for the convenience and comfort of the rapist is not a kidnapping; the removal from a public place to a place of seclusion is. The forced direction of a store clerk to cross the store to open a cash register is not a kidnapping; locking him in a cooler to facilitate escape is. The list is not meant to be exhaustive, and may be subject to some qualification when actual cases arise; it nevertheless is illustrative of our holding." 219 Kan. at 216.

Larsen primarily relies on two cases—*State v. Fisher*, 257 Kan. 65, 891 P.2d 1065 (1995), and *Messer v. Roberts*, 74 F.3d 1009 (10th Cir. 1996)—to support his position. In *Fisher*, our Supreme Court explained forcing a manager to walk through a restaurant and into the office to obtain a key to the safe did not make the robbery substantially easier to commit, substantially lessen the risk of detection, nor did it have significance independent of the crime of robbery. Rather, the defendant's actions were merely for the robber's convenience and such taking or confinement was insufficient to constitute a kidnapping. 257 Kan. at 78.

11

In *Messer*, the defendant committed an aggravated battery and, while the victim was unconscious, moved her body about 15 feet. The defendant placed the victim in the open store in a main walkway and not hidden or concealed. The Tenth Circuit Court of Appeals determined the defendant completed the aggravated battery before he dragged the victim and the taking occurred. Because the defendant already completed the crime of aggravated battery, dragging the victim did not make commission of the crime substantially easier nor did it substantially lessen the risk of detection. The victim's second beating, after she was moved, did not occur in a different room or in an area that could have hidden the incident from view. The Tenth Circuit also reasoned the movement was "'slight, inconsequential and merely incidental' to the crime of aggravated battery." 74 F.3d at 1014.

Here, Larsen was in the Mason-Hauser residence without authority and exerted unauthorized control of Hauser's purse and both Mason and Hauser's car keys before Larsen ordered Mason at gunpoint to move and go down the stairs to be by the garage door to aid in Larsen's escape from the residence out the back door. See K.S.A. 2016 Supp. 21-5807(a)(1) (burglary is entering into or remaining within any dwelling, without authority, with intent to commit felony, theft, or sexually motivated crime therein); K.S.A. 2016 Supp. 21-5801(a)(1) (theft is intent to permanently deprive owner of possession, use, or benefit of owner's property by obtaining or exerting unauthorized control over property). Just as in *Messer*, Larsen had already completed the crimes of theft and burglary before he confined Mason in the stairway at gunpoint to aid in his escape. Confining Mason did not make commission of the crimes substantially easier. But, unlike *Messer*, confining Mason by gunpoint substantially lessened the risk of detection.

With respect to the same *Buggs* factor—lessening the risk of detection—the State relies on *State v. Richmond*, 258 Kan. 449, 453, 904 P.2d 974 (1995), in which our Supreme Court explained confining a victim in an unlocked closet made the robbery

12

easier for the defendant and enabled the defendant to flee without being apprehended. The victim was unable to see the defendant, unable to see the defendant's vehicle, and unable to see which direction the defendant traveled when he fled from the residence. The victim was delayed in coming out of the closet and calling for help because she did not know when the defendant was gone. The court found the victim's confinement facilitated the defendant's flight and sufficient evidence existed to support a kidnapping conviction. 258 Kan. at 454.

Larsen forced Mason by threatening him at gunpoint to go down the staircase toward the garage to facilitate an escape from the residence and lessen Larsen's risk of detection. Larsen specifically demanded Mason "get away from the back door," and then Larsen demanded Mason walk toward him and go down the stairs. The purpose of Larsen's demands allowed him to flee through the back door, which lessened the risk of detection by going through the front door and into the neighborhood. The Mason-Hauser residence backed up to a park providing Larsen with an opportunity to escape undetected from any neighbors or passersby. Mason was delayed from leaving the staircase by the garage and trying to see which direction Larsen may have gone before calling for help. The forced moving of Mason was not for Larsen's comfort or convenience to commit the crime of aggravated burglary or theft.

A panel of this court explained:

"[A] court may find independent significance not only when an act *actually* makes a crime substantially easier to commit but also when the act has the *potential* to do so, even if the defendant never received the anticipated benefit. It is the nature of the act, not its result, that is legally important. Thus, whether the taking here would make the robbery substantially easier to commit or would substantially reduce the risk of detection should be viewed from [the defendant's] perspective when he forced [the victim] into the restaurant at gunpoint—not with the benefit of hindsight, now knowing that [the victim] was able to get away." *State v. Kane*, 57 Kan. App. 2d 522, 532, 455 P.3d 811 (2019).

13

A reasonable fact-finder could have concluded, from Larsen's perspective, the risk of detection was decreased by forcing Mason into the stairway away from Larsen's ideal point of exit. Viewing the evidence in the light most favorable to the State, a rational fact-finder could have found Larsen guilty beyond a reasonable doubt. See *Aguirre*, 313 Kan. at 209. Larsen's taking and confining of Mason meets the three *Buggs* factors. Larsen's act—threatening Mason at gunpoint—allowed him to flee the residence and was not slight, inconsequential, or merely incidental to the burglary. See *Harris*, 310 Kan. at 1032. Moving Mason down into the stairway is not inherent in the crimes of burglary or theft. See K.S.A. 2016 Supp. 21-5807(a)(1); K.S.A. 2016 Supp 21-5801(a).

*Attempted aggravated burglary*

Larsen contends he initially intended to enter the Tinsley house on May 27, 2017, but, upon seeing Tinsley inside the residence, he left before committing an overt act toward perpetration of the aggravated burglary. Larsen argues the State failed to present sufficient evidence establishing he touched the Tinsley house or made any attempt to enter the house. The State responds that Larsen's text messages clearly established his intent to commit an aggravated burglary at the Tinsley residence until the point at which Tinsley discovered him. The State suggests we should reject Larsen's arguments as he is again inviting us to reweigh evidence.

The jury convicted Larsen of attempted aggravated burglary in violation of K.S.A. 2016 Supp. 21-5807(b) and K.S.A. 2016 Supp. 21-5301(a). K.S.A. 2016 Supp. 21-5807(b)(1) defines aggravated burglary as "without authority, entering into or remaining within any . . . Dwelling in which there is a human being, with intent to commit a felony, theft or sexually motivated crime therein." K.S.A. 2016 Supp. 21-5301(a) defines an attempt as "any overt act toward the perpetration of a crime done by a person who intends to commit such crime but fails in the perpetration thereof or is prevented or intercepted in executing such crime." There is no definitive rule to determine what constitutes an overt

14

act as opposed to mere preparation, which is insufficient to establish an attempt crime. *State v. Garner*, 237 Kan. 227, 238, 699 P.2d 468 (1985).

The overt act the State relied on to prove the crime of attempted aggravated burglary was when Larsen looked inside the window of the Tinsley residence. The district court instructed the jury on the elements of the completed offense of aggravated burglary as well as the crime of attempt.

Another panel of our court explained:

"Gauging intent is often an imprecise task. Jurors must determine what is going on inside a person's head, and criminals routinely disavow any bad purpose. Jurors are left to survey the circumstances to discern a defendant's actual intent. So it is in ferreting out whether someone has the requisite intent to commit a theft, thereby supporting a conviction for burglary, aggravated burglary, or, in this case, an attempt. The jurors may consider 'the totality of the surrounding circumstances,' in a burglary prosecution, including 'the manner of the entry, the time of day, the character and contents of the building, the person's actions after entry . . . , and the intruder's explanation, if he or she decides to give one.' [Citations omitted.]" *State v. Hargrove*, 48 Kan. App. 2d 522, 564-65, 293 P.3d 787 (2013).

In some cases, the intent to commit the felony is so clearly shown by other evidence that it is enough that the defendant arrived at the scene at which he planned for the crime to occur. See *Garner*, 237 Kan. at 239-40. In fact, the requisite criminal intent to support a conviction of burglary is seldom susceptible to direct proof and, instead, must be "inferred from the surrounding facts and circumstances." *State v. Harper*, 235 Kan. 825, 828, 685 P.2d 850 (1984).

Larsen admitted he was the individual depicted on Tinsley's security video. The State presented strong circumstantial evidence Larsen was in the fenced backyard

intending to enter the Tinsley residence, without authority, to commit a theft therein but failed in the perpetration. The jury heard about Larsen's relationship with Bradford and learned of the following text messages Larsen sent to Bradford around the time of the Tinsley incident:

- "'So do you want me to get "dollar sign" for you to come live here with me?'"—sent on May 25, 2017, at 7:20 p.m.

- "'Main goal, get you here. You know I go hard.'"—sent on May 25, 2017, at 7:23 p.m.

- "'I always will only do what I can get away with.'"—sent May 25, 2017, at 7:27 p.m.

- "'I'm coming to you. It's hard not to come right now, but I don't have the money to get to you, but I'm on my way.'"—sent May 25, 2017, at 10:51 p.m.

- "'I want to make money. I want to rob to do it.'"—sent May 26, 2017, at 1:07 a.m.

- "'I think I'm going to go out and get cash tonight.'"—sent May 27, 2017, at 12:21 a.m.

- "'. . . I want your opinion on what I should do tonight, otherwise I'm going to make it happen and come tonight just to see you and do what you want done.'"—sent May 27, 2017, at 7:14 p.m.

- "'I'm working on "dollar sign" for you. A car of your own. Take your time and I'll let you know what I got for you.'"—sent May 27, 2017, at 10:17 p.m.

- "'I just got my phone back, Babe. I lost it running from the cops. Someone seen me and I almost got caught breaking in.'"—sent May 28, 2017, at 5:58 a.m.

- "'I'm leaving it up to you to tell me if you want me to flip this 150 "dollar sign" now while I'm here still waiting or do you want me to let you have the 150 and do what you do when I get there, because I can double it, but it is going to take at least an hour or two and I'm not really willing to wait to get to you. So whatever you want, tell me fast.'"—sent May 30, 2017, at 9:05 p.m.

The jury also heard testimony about the aggravated burglary at the Mason-Hauser residence, which was comparable to the incident at the Tinsley residence. Larsen was wearing a bandana around his face at the Tinsley residence, had a bandana around his neck at the Mason-Hauser residence, and the primary DNA found on the bandana at the Mason-Hauser residence was consistent with Larsen's. In both incidents, Larsen either entered or attempted to enter the house through the back door. The State also presented evidence diminishing Larsen's defense theory of intoxication during the Tinsley incident as he was not stumbling or showing signs of intoxication in the security video and his text messages were coherent.

Considering the evidence in the light most favorable to the State, a reasonable fact-finder could determine Larsen did more than just prepare to commit the crime of burglary at the Tinsley residence. Larsen entered the Tinsleys' fenced backyard and committed the overt act of looking into the Tinsley residence through the back window with the intent to enter the house and commit a crime therein. In fact, such act aligned with the evidence related to the Mason incident. Hauser's purse was left on the breakfast table and visible from the back window. The State suggested Larsen's conduct indicated

he was sizing up the Tinsley house to determine whether it was worth robbing until Tinsley discovered him peering through the window and Larsen fled from the scene.

Larsen next argues the State failed to prove he attempted to commit an aggravated burglary because the presence of a human being in the dwelling is a key element of the aggravated crime and he decided not to enter the house when he saw Tinsley inside. Larsen seems to recognize our Supreme Court has determined: "Neither aggravated burglary nor attempted aggravated burglary require proof of knowledge that there was a human being present in the building." *State v. Watson*, 256 Kan. 396, 401, 885 P.2d 1226 (1994). Thus, Larsen's knowledge of whether a residence was occupied is irrelevant to whether an aggravated burglary was attempted.

Larsen cites K.S.A. 2021 Supp. 21-5202(f), which states:

"If the definition of a crime prescribes a culpable mental state that is sufficient for the commission of a crime, without distinguishing among the material elements thereof, such provision shall apply to all the material elements of the crime, unless a contrary purpose plainly appears."

The State points out Larsen failed to mention the following subsection, K.S.A. 2021 Supp. 21-5202(g), which states:

"If the definition of a crime prescribes a culpable mental state with regard to a particular element or elements of that crime, the prescribed culpable mental state shall be required only as to specified element or elements, and a culpable mental state shall not be required as to any other element of the crime unless otherwise provided."

The crime of aggravated burglary prescribes a culpable mental state with regard to a particular element of the crime—the intent to commit a felony, theft, or sexually motivated crime in the residence. K.S.A. 2016 Supp. 21-5807(b)(1); *State v. White*, No.

18

112,939, 2016 WL 1169435, at *6 (Kan. App. 2016) (unpublished opinion). There is no requirement the defendant know or intend that the dwelling be occupied. *Watson*, 256 Kan. at 401.

The State presented sufficient evidence reflecting a reasonable fact-finder could determine Larsen committed an overt act toward the commission of an aggravated burglary by looking in the window to discover if the house was occupied before trying to enter the house. We do not reweigh evidence, resolve evidentiary conflicts, or make witness credibility determinations. *Aguirre*, 313 Kan. at 209. And the presence of the Tinsley family in the residence at the time of Larsen's attempted burglary escalated the crime to an attempted aggravated burglary.

*The State Did Not Improperly Vouch for Its Witness During Closing Argument.*

Larsen argues the State improperly vouched for Mason's credibility during closing argument by expressing its opinion Mason knew the intruder was Larsen. Larsen also argues the error was compounded by the district court's failure to give a cautionary instruction to the jury on eyewitness testimony. Larsen admits he did not request such an instruction and, standing alone, failure to give the instruction was not clearly erroneous. Larsen seeks reversal and remand for a new trial related to his convictions from the Mason incident—kidnapping, aggravated burglary, and misdemeanor theft—based on the alleged instructional error combined with the alleged prosecutorial error.

The State responds it advanced permissible commentary on Mason's testimony as Mason "did not hesitate" to identify Larsen in court. The State also asserts it properly commented on Mason's demeanor and made an argument based on a reasonable inference from the evidence without expressing an opinion.

*Standard of Review*

A prosecutor's comments made during voir dire, opening statement, or closing argument are reviewed by appellate courts even if the defendant failed to contemporaneously object. *State v. Sean*, 306 Kan. 963, 974, 399 P.3d 168 (2017). Appellate courts use a two-step process—looking at error and prejudice—to evaluate claims of prosecutorial error.

> "To determine whether prosecutorial error has occurred, the appellate court must decide whether the prosecutorial acts complained of fall outside the wide latitude afforded prosecutors to conduct the State's case and attempt to obtain a conviction in a manner that does not offend the defendant's constitutional right to a fair trial. If error is found, the appellate court must next determine whether the error prejudiced the defendant's due process rights to a fair trial." *State v. Sherman*, 305 Kan. 88, 109, 378 P.3d 1060 (2016).

*Error*

"Prosecutors enjoy wide latitude in crafting closing arguments. This latitude allows a prosecutor to argue reasonable inferences that may be drawn from the admitted evidence, but it does not extend so far as to permit arguing facts that are not in evidence. [Citations omitted.]" *State v. Pribble*, 304 Kan. 824, 832, 375 P.3d 966 (2016). Prosecutors are not permitted to offer personal opinions about the credibility of witnesses that would constitute "'unsworn, unchecked testimony'" or to attempt to shift the burden of proof to the defendant. 304 Kan. at 835, 837. A prosecutor's statements should not be viewed in isolation but in the context in which the statements were made. *State v. Timley*, 311 Kan. 944, 949-50, 469 P.3d 54 (2020).

Larsen alleges the prosecutor erred in her rebuttal closing argument by expressing her own opinion on Mason's credibility. With respect to the incident at the Mason-Hauser residence, the prosecutor stated:

"But what really is the most important fact about all that discussion is that bandana is around the neck. So now we have a face-to-face view between [Mason] and the Defendant, plenty of time to look at those eyes, plenty of time to know he's the person that did that to him.

"So he moves into the photo lineup. Remember what [Mason] said? He was like, I wasn't 100 percent sure of those five or six pictures. And what [Mason] said was that he had just a torso, like the top of the torso, and then just the head."

"These are not live photo lineups. These are not pictures that were taken of the Defendant the day of the crime. These are previous pictures. [Mason] wasn't 100 percent sure. That doesn't make [Larsen] not guilty. When [Mason] sat in that chair [on the witness stand at trial] and he looked into those eyes, he knew that was the person that held him at gunpoint. That is a traumatic event that you don't forget."

Larsen specifically had an issue with the prosecutor's statement that Mason knew Larsen was the intruder who held him at gunpoint. However, the prosecutor was not expressing her personal opinion on the matter but was recalling the evidence elicited at trial. Mason identified Larsen in the courtroom as the man who was in his house on the night of the incident holding a bag in his hands, as reflected by the following testimony:

"[Prosecutor]: So you see this individual holding a bag in both hands.

"Did you know him?

"[Mason]: I did not.

"[Prosecutor]: Is he present in the courtroom today?

"[Mason]: He is.

"[Prosecutor]: Would you please point him out and identify what he's wearing?

"[Mason]: He's here in the white shirt and the tie.

"[Prosecutor]: Does he appear different than he did that night?

"[Mason]: He does.

"[Prosecutor]: What's different about him?

"[Mason]: His hair and his beard, and his glasses are smaller.

"[Prosecutor]: So how far—so you're standing right—initially just into the living room, correct, from the breakfast nook?

"[Mason]: Correct.

"[Prosecutor]: And he's over by the red chair?

"[Mason]: Correct.

"[Prosecutor]: What would that distance be, approximately?

"[Mason]: 15 to 20 feet."

Mason also testified he met with a detective who showed Mason the security video from the Tinsley incident a few days before. Mason told the detective he was about 80 percent sure the man in the security video was the man who entered his house. The prosecutor asked: "And what was it about the video that made you 80 percent sure it was the same person?" Mason responded: "The glasses, his bald head, his build, and just had a gut feeling. And by seeing him in here, it really made me think that that's the guy." Mason also stated he was confident on the day he testified that Larsen was the person in his residence who held him at gunpoint. In fact, during Larsen's cross-examination, Larsen admitted Mason did not hesitate to pick him out as the person who held Mason at gunpoint.

Using the two-step process—looking at error and prejudice—we observe the prosecutor did not exceed the wide latitude afforded to conduct the State's case and attempt to obtain a conviction without offending Larsen's constitutional right to a fair trial. See *Sherman*, 305 Kan. at 109. During closing argument, the prosecutor relied on and made reasonable inferences about admitted evidence. The prosecutor argued Mason knew the intruder was Larsen after Mason stated such facts during his testimony.

Further, the prosecutor's statement in closing argument should not be viewed in isolation but in the context in which her statement was made. See *Timley*, 311 Kan. at 949-50. While the prosecutor stated Mason knew the intruder was Larsen, she also acknowledged to the jury Mason had other opportunities to identify the suspect and was unable to do so. The prosecutor did not vouch for Mason's credibility before the jury or state her personal opinion. Rather, the prosecutor's statement was based on admitted

22

evidence. The prosecutorial acts did not fall outside the wide latitude afforded to conduct the State's case.

*Prejudice*

Even if we were to find the prosecutor erred, Larsen's claim still fails under the prejudice prong as the prosecutor's closing statements were harmless and did not affect the outcome of Larsen's trial. See *Sherman*, 305 Kan. at 109-10. Larsen contends Mason's identifications were inconsistent and, by stating Mason *knew* Larsen was the intruder, the State inappropriately vouched for the witness. Larsen suggests the bandana found on Mason's back deck was not sufficient on its own to prove beyond a reasonable doubt Larsen was the intruder.

Instances of prosecutorial error are fact-specific, and parties are allowed "the greatest possible leeway to argue the particulars of each individual case." 305 Kan. at 110. The jury heard testimony that the entire interaction between Mason and Larsen lasted about five minutes and that Mason was unable to identify Larsen with certainty from a photo lineup after the incident. The jury, however, also heard testimony about the intruder's physical description—a clean shaven, Black man standing about 5' 10" tall with a bald head, big glasses, and a bandana around his neck. The bandana did not cover the intruder's face.

The jury viewed the same security video from the Tinsley incident that was shown to Mason. Larsen admitted he was the man depicted in the security video and, aside from Mason directly pointing out Larsen as the intruder at trial, Mason's description of the intruder matched many characteristics of the man in the security video. In fact, Mason explained he knew the man in the security video was the same man who entered his house without permission on that night because of the man's glasses, bald head, and build. The jury also heard testimony the man in the Mason-Hauser residence was wearing

23

a bandana around his neck, and a gray bandana was found on the back deck of the residence just after the incident. Larsen not only admitted to owning and carrying around a gray bandana, but he also was seen wearing the bandana in the security video from the Tinsley residence. The primary source of DNA found on the bandana left at the Mason-Hauser residence was Larsen's.

Additionally, the jury heard testimony about incriminating text messages on Larsen's phone sent around the time of the Mason incident, stating he did not have money but would get some and he would rob to do it so long as he could get away with it. The State presented a strong case against Larsen. Even if the prosecutor's statement in closing argument was in error, it was harmless and did not affect the outcome of Larsen's trial. See *Sherman*, 305 Kan. at 109-10.

*The District Court Did Not Err in Imposing an Upward Durational Departure Sentence on Larsen's Primary Conviction of Kidnapping.*

Larsen contends, for the first time on appeal, that the two nonstatutory aggravating factors the State relied on in its motion for an upward durational departure sentence on his primary conviction of kidnapping led to an illegal sentence. Larsen asserts the aggravating factors applied to his sentence are not found in the statute authorizing an upward durational departure and, because the factors are elements of the enhanced-sentence crime, due process requires every element of a crime be listed in the statutes. Larsen does not assert the district court abused its discretion in imposing an upward durational departure.

The State correctly responds Larsen's illegal sentence claim is, in fact, a claim of constitutional error, which does not meet the statutory definition of an illegal sentence. See *State v. Moncla*, 301 Kan. 549, 553-54, 343 P.3d 1161 (2015) ("'Because the definition of an illegal sentence does not include a claim that the sentence violates a

constitutional provision, a defendant may not file a motion to correct an illegal sentence based on constitutional challenges to his or her sentence.' [Citations omitted.]"). The State also correctly points out Larsen improperly raised his claim of constitutional error for the first time on appeal.

Generally, a party cannot assert a new constitutional argument on appeal. There are three exceptions to the general rule:

> "'(1) The newly asserted claim involves only a question of law arising on proved or admitted facts and is determinative of the case; (2) consideration of the claim is necessary to serve the ends of justice or to prevent the denial of fundamental rights; or (3) the district court is right for the wrong reason.' [Citations omitted.]" *State v. Godfrey*, 301 Kan. 1041, 1043, 350 P.3d 1068 (2015).

Larsen admits he did not raise the issue of constitutionality below but asserts the issue involves a question of law arising on proved or admitted facts and would be determinative of the case. He also claims consideration is necessary to serve the ends of justice because if the district court had not departed, his kidnapping sentence would be much shorter. However, we are not obligated to consider an unpreserved claim even if the claim may meet an exception to the general rule. *State v. Gray*, 311 Kan. 164, 170, 459 P.3d 165 (2020). Because Larsen did not preserve this issue below, we exercise our prudential authority and decline to address it.

Affirmed.